**ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,**

v.

**Douglas M. COSTLE, Administrator, Environmental Protection Agency, Respondent.**

No. 75–2224.

United States Court of Appeals, District of Columbia Circuit.

Argued April 5, 1977.

Decided Feb. 10, 1978.

Jacqueline M. Warren, Washington, D. C., for petitioner.

Erica L. Dolgin, Atty., Department of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen. and Thomas A. Larsen, Atty., Environmental Protection Agency, Washington, D. C., were on the brief for respondent. Edmund B. Clark, Atty., Department of Justice, Washington, D. C., also entered an appearance for respondent.

Stewart H. Freeman and Gregory T. Taylor, Asst. Attys. Gen., State of Michigan, Lansing, Mich., filed a brief on behalf of Environmental Protection and Natural Resources Division of Michigan, et al. as amicus curiae urging affirmance.

John S. McCreery, Washington, D. C., filed a brief on behalf of the Illinois Environmental Protection Agency as amicus curiae urging affirmance.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case calls on us to consider the duties of the Environmental Protection Agency (EPA) under the Safe Drinking Water Act[1] passed on December 18, 1974.

## I. INTRODUCTION

In this statute, Congress responded to accumulating evidence that our drinking water contains unsafe levels of a large variety of contaminants. The Act requires the Environmental Protection Agency to promulgate regulations restricting the concentration of such substances in drinking water.

The present action is brought by the Environmental Defense Fund (EDF), a nonprofit organization concerned with environmental issues. EDF challenges the adequacy of interim regulations promulgated under the Act, urging that they fail to restrict levels of certain substances that may be harmful, and fail to require adequate monitoring of other substances.

The EPA responds by stressing the poverty of clearcut information concerning the harmfulness of the substances in question, and the lack of a satisfactory method for determining their levels in drinking water. These considerations, argues the Agency, make it unfeasible to formulate more extensive regulations at the present time. The Agency's position is reinforced by the fact that the challenged regulations are interim; the statutory scheme provides for the development of more definitive regulations at a later time.

The dispute poses for this court the difficult task of determining whether the agency has exceeded the bounds of its permissible discretion, in an area characterized by scientific and technological uncertainty. Where administrative judgment plays a key role, as is unquestionably the case here, this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives. At the same time, we must be cognizant of our duty to scrutinize with care the actions under challenge, to determine whether a rational basis for them may be discerned. Our responsibility is particularly weighty where, as here, serious issues of public health are involved on a potentially vast scale.

## II. THE STATUTORY SCHEME

The Safe Drinking Water Act provides that the Administrator of the Environmental Protection Agency shall promulgate national drinking water standards in three phases. The first phase leads to the promulgation of "interim primary drinking water regulations" (interim regulations). These regulations set maximum contaminant levels (MCL) for substances that the Administrator finds may have an adverse effect on health, or, where that is not feasible, specify treatment techniques to reduce the level of the contaminant.[2] They are intended to "protect health to the extent feasible, using technology, treatment techniques, and other means, which the Admin-

---

1. Pub. L. 93–523, 88 Stat. 1660 (codified at 42 U.S.C. §§ 300f to 300j–9 (Supp.1977) ).

2. Sec. 1401(1)(B), (C), 42 U.S.C. § 300f(1)(B), (C).

istrator determines are generally available (taking costs into consideration) on the date of enactment of this title."[3] Proposed interim primary drinking water regulations were to be published within 90 days after the passage of the Act. Final interim regulations were to be promulgated 180 days after passage of the Act.[4] The interim regulations were to take effect eighteen months after the date of their promulgation.[5]

The second phase results in the promulgation of "revised national primary drinking water regulations" (revised regulations). These regulations also set MCL's or specify treatment techniques.[6] They must be formulated to reduce contaminant levels as nearly as is feasible to levels at which no adverse effects on health occur. Feasibility is to be determined with reference to the best technology generally available, taking cost into consideration.

To lay the groundwork for phase two, the Act directs the Administrator to enter into an appropriate arrangement with the National Academy of Sciences or another independent scientific organization to conduct a study to determine the existence of drinking water contaminants that may pose a health problem and, where possible, to establish safe maximum contaminant levels for these substances. A report of the results of this study is to be made to Congress within two years after passage of the Act and a summary of the report is to be published in the Federal Register. Within 90 days after publication of the report, the Administrator is required to formulate proposed revised national primary drinking water regulations, based on the findings contained in the report. Within 180 days after the date of the proposed revised regulations, the Administrator must promulgate

revised regulations. These regulations are to take effect 18 months after promulgation.

The third and final phase of regulation generates "national secondary drinking water regulations" (secondary regulations). The Administrator is required to publish proposed "national secondary drinking water regulations" within 270 days after the date of the Act's passage. Within 90 days after publication of such proposed regulations, he must promulgate secondary regulations. The Act does not specify when these regulations are to take effect.

Regulations promulgated in all three phases may be amended.[7]

## III. CHALLENGES TO THE INTERIM REGULATIONS

Pursuant to statute, on March 14, 1975, the Administrator published proposed interim regulations for public comment. In the course of the proceedings, EDF challenged the adequacy of the proposed regulations. Subsequently, on December 10, 1975, the Administrator promulgated the interim regulations. In this appeal, EDF challenges four specific aspects of these regulations: 1) the failure to fully control organic contaminants in drinking water; 2) the adequacy of the MCL for fluoride; 3) the failure to regulate sodium and sulfates; 4) the adequacy of the monitoring required for cadmium and lead. It will be helpful to detail the nature of the dispute on each point.

### A. Regulation of Organics

The interim regulations provide MCL's for only six organic contaminants[8] out of the large number of such substances known to be present in drinking water. They do

---

3. Sec. 1412(a)(2), 42 U.S.C. § 300g–1(a)(2).

4. Final interim regulations were actually promulgated on Dec. 10, 1975. 40 F.R. 59566 (Dec. 24, 1975).

5. *I. e.*, in June, 1977.

6. Sec. 1401(1)(B), (C), 42 U.S.C. § 300f(1)(B), (C).

7. Sec. 1412(b)(4), (c), 42 U.S.C. § 300g–1(b)(4), (c).

8. 40 C.F.R. § 141.12. The contaminants covered are Endrin, Lindane, Methoxychlor, Toxaphene, 2, 4–D, and 2, 4, 5–TP.

not specify treatment techniques for reducing organics. EDF argues that the legislative intent was that comprehensive regulation of organics should commence with the interim regulations. It points to accumulating evidence not only of the presence of large numbers of organic substances in drinking water, but of correlations between such contaminants and human health consequences, including cancer. It urges the need to set a limit on *total* organic content of drinking water, by adoption of some chemical measure which would serve as a surrogate for total organic content.

The EPA responds that the interim regulations were meant to be less comprehensive than the revised regulations and, more specifically, that Congress did not anticipate a comprehensive regulation of organics under the interim regulations. The EPA further stresses that the effects of long-term ingestion of organic contaminants in drinking water are not yet clear, making it difficult to set MCL's for these substances. In addition, argues the EPA, information on the efficacy and expense of available treatment techniques is incomplete. Thus, its decision to limit regulation of organics to six substances is presented as a legitimate exercise of agency discretion.

## B. *Regulation of Inorganic Substances*

### 1. *Fluoride*

The MCL for fluoride specified by the interim regulations is based on the principle that drinking water may usefully contain sufficient fluoride to provide optimal protection against dental caries, but that the amount by which such levels are exceeded should be limited, so as to avoid undue side-effects—primarily mottling of the teeth (fluorosis), a condition with only es-

thetic significance. The MCL established by the Administrator permits fluoride levels up to two times the optimal protective level. EDF argues that the permitted level is too high: the severity of fluorosis is proportional to fluoride concentrations; thus, permitting levels to greatly exceed the optimal therapeutic level violates the duty of the Administrator to formulate interim regulations that will protect health "to the extent feasible."

In response, the EPA cites authority to the effect that the levels in question do not pose a health hazard.[9] The EPA views the matter as essentially one of line-drawing, in which it properly exercised reasonable discretion.

### 2. *Sodium and Sulfates*

Neither of these substances is controlled under the interim regulations.[10] The EDF argues that the health effects of these substances are well established[11] and that regulation was mandated by the Act.

The EPA believes that the setting of MCL's for these substances would have been inappropriate, since individual response to their presence in drinking water varies over a broad continuum. While monitoring of these levels and notification of those concerned might be desirable,[12] EPA concluded that it lacked authority under the Act to require such programs.

### 3. *Cadmium and Lead*

The interim regulations set MCL's for both of these substances. The parties do not dispute the fact that their presence in drinking water represents a potential danger to health. Rather, EDF focuses on the manner in which the levels of these contam-

9. EPA relies upon consultations with the Department of Health, Education and Welfare, and with the National Drinking Water Advisory Council. Brief for the Respondent at 35–38.

10. In the Preamble to the interim regulations, as published in the Federal Register, the Agency does *recommend* that the states monitor sodium and sulfates, and notify consumers and physicians of these levels where appropriate. 40 F.R. 59567 (Dec. 24, 1976).

11. Sodium intake is of concern to individuals on sodium-restrictive diets—primarily those suffering from hypertension or congestive heart failure. Sulfates have a laxative effect on newcomers to a community whose water contains high sulfate levels.

12. See footnote 11 *supra*.

inants in drinking water are to be monitored under the interim regulations. While levels are monitored at the tap [13] (thus insuring that contributions from the distribution and plumbing systems will be reflected), samples are required to be tested only annually,[14] and the size and distribution of sampling is not specified. EDF objects that more frequent sampling, of a specified size and distribution, is needed in order adequately to control the contributions of cadmium and lead from distribution sources, which vary widely in the extent to which they are responsible for these substances in drinking water.

The EPA defends its monitoring requirements on the ground that, in its judgment, more extensive monitoring cannot be justified in light of the added expense. The agency points out that injurious effects from these substances result from long-term exposure, thus permitting correction of deviation from safe levels before harm to the public has resulted. The agency thus views its monitoring requirements as an appropriate exercise of its discretion.

## IV. THE INTENT OF THE LEGISLATURE

This case involves conflicting contentions as to the nature of our present state of knowledge in the pertinent areas. We begin, however, by noting that the parties differ in their apprehension of legislative intent, and by making our own effort to discern the will of Congress.

### A. *The Statutory Language*

The phased structure of the statutory scheme suggests that formulation of the regulations is intended to be progressive in nature, adapting to increasing knowledge and experience in the area. Yet the statutory language does not dispose of the general issue presented by petitioners: How comprehensive did Congress intend the interim regulations to be?

The opening section of the Act defines the term "primary drinking water regulation" (which includes both interim and revised regulations) as a regulation "which specifies contaminants which  .  .  . may have any adverse effect on the health of persons  .  .  .."[15] Petitioner EDF, stressing the word "may,"[16] urges that this language reflects a legislative intent that interim, as well as revised, regulations should cover *all* substances in drinking water that may adversely affect health. While there is room for argument, it is our view that the language is more naturally read as a definition—which it purports to be—than as a legislative command.

In another provision, § 1412(a)(2) of the Act states that interim primary regulations "shall protect health to the extent feasible, using technology, treatment techniques, and other means which the Administrator determines are generally available (taking costs into consideration) on the date of enactment of this Act [December 16, 1974]."[17] Read by itself, this language can be taken as extremely comprehensive. We think, however, that the Congressional intent to avoid a requirement of broadest comprehensiveness is discernible when the above language is read alongside the statutory language concerning the (greater) comprehensiveness of *revised* regulations. Section 1412(b) of the Act requires the revised primary regulations to

specify a maximum contaminant level or require the use of treatment techniques for each contaminant for which a recommended maximum contaminant level is established or which is listed in a rule under paragraph (1)(B). The maximum contaminant level specified in a revised national primary drinking water regulation for a contaminant shall be as close to the recommended maximum contaminant level established under paragraph (1)(B) for such contaminant as is feasible. A

13. 40 C.F.R. § 141.2(c).

14. 40 C.F.R. § 141.23.

15. Section 1401(1)(B), 42 U.S.C. § 300f(1)(B).

16. Brief for Petitioner at 8.

17. 42 U.S.C. § 300g–1(a)(2).

required treatment technique for a contaminant for which a recommended maximum contaminant level has been established under paragraph (1)(B) shall reduce such contaminant to a level which is as close to the recommended contaminant level as is feasible. A required treatment technique for a contaminant which it listed under paragraph (1)(B) shall require treatment necessary in the Administrator's judgment to prevent known or anticipated adverse effects on the health of persons to the extent feasible. For purposes of this paragraph, the term "feasible" means feasible with the use of the best technology, treatment techniques, and other means, which the Administrator finds are generally available (taking cost into consideration).[18]

This provision in paragraph (3) of § 1412(b) must be read in conjunction with paragraph (1)(B) of that section, which requires the Administrator to establish recommended maximum contaminant levels for, or at least list, *each* contaminant which, in his judgment,[19] may have any adverse effect on health. Hence the passage from paragraph (3) quoted above requires in turn that he specify a MCL, or a mandatory treatment technique, for *each* contaminant which *may* pose a threat to health. The statutory language is thus unambiguous (though perhaps labyrinthine) in its requirement that the revised regulations be fully comprehensive in scope. The language of section 1412(a) which seems universal when taken by itself is perceived on study to be silent as to scope of the interim regulations, and in contrast with the wording for revised regulations. There is more room for administrative discretion than first appears.

There is also a tightening between section 1412(a) and section 1412(b) as to substantive content. Both sections use the term "feasible," and there is flexibility to consider costs. But section 1412(a) provides that the interim regulations shall protect health to the extent feasible using technology generally available on December 16, 1974, while section 1412(b) provides that the revised regulations shall use the *best* technology generally available.

The text of the statute indicates that the regulations are to become progressively more comprehensive and demanding. The words used give some signals of intent. However, it is the history of the legislation that is more enlightening and reenforcing of what we glean initially from the words alone.

### B. The Legislative History

Prior to the passage of the Safe Drinking Water Act, the only enforceable federal standards for drinking water were directed at communicable waterborne diseases. These were promulgated under the Public Health Service Act.[20] Under that law, the Public Health Service published, in 1962, recommended—*i. e.*, nonenforceable—guidelines for drinking water contaminants unrelated to communicable disease.[21]

Congress passed the Safe Drinking Water Act in response to increasing indications of a serious threat to health from contaminants in our drinking water not related to communicable disease. The legislative history contains abundant evidence that Congress intended the rapid implementation of broad mandatory controls over impurities. The Report of the House Committee on Interstate and Foreign Commerce [22] sets a general tone of urgency in stating that

the lack of comprehensive cost, health effects, technological assessment, and monitoring data cannot justify any further delay in Congressional and administrative action. While it would be desira-

---

**18.** Section 1412(b)(3), 42 U.S.C. § 300g–1(b)(3).

**19.** Based on the report on the study conducted by the National Academy of Sciences. See 188 U.S.App.D.C. ———, 578 F.2d 340, *supra*.

**20.** 42 U.S.C. § 264 (1974).

**21.** Public Health Service Drinking Water Standards, Department of Health, Education and Welfare, 1962.

**22.** H.R.Rep. No. 93–1185, 92d Cong., 2d Sess. (1974); U.S.Code Cong. & Admin.News 1974, p. 6454.

ble to have complete health effects research, effective treatment technology, and accurate, inexpensive monitoring systems in operation prior to commencing a system of regulation, this is simply not possible. It is the . . . intent [of the Committee] that EPA, the States, and the public water systems begin now to maximize protection of the public health insofar as possible, and to continue and expand these efforts as new more accurate data, technology, and monitoring equipment become available.[23]

Specifically, the House Report indicates that controls were not to be delayed pending the development of more refined data on health effects and more efficient detection and treatment technology.

> Primary regulations [i. e., both interim and revised] must specify contaminants which in the judgment of the Administrator may have an adverse effect on the health of persons when found in drinking water. The words used by the Committee were carefully chosen. Because of the essentially preventive purpose of the legislation, the vast number of contaminants which may need to be regulated, and the limited amount of knowledge presently available on the health effects of various contaminants in drinking water, the Committee did not intend to require conclusive proof that any contaminant *will* cause adverse health effects as a condition for regulation of a suspect contaminant. Rather, all that is required is that the Administrator make a reasoned and plausible judgment that a contaminant *may* have such an effect.[24]

A further suggestion of the legislature's intent with regard to organic contaminants is seen in its expectation that the interim regulations "would be based largely on a review and updating of the United States Public Health Service drinking water standards" as conducted by the EPA Advisory Committee on the Revision and Application of the Drinking Water Standards in 1973. House Report at 17; U.S.Code Cong. & Admin.News 1974, p. 6470. Both the 1962 Public Health Service Drinking Water Standards and the 1973 recommendations of the EPA Advisory Committee on the Revision and Application of the Drinking Water Standards include a surrogate for total organics.

## V. EVALUATION OF THE CHALLENGED REGULATIONS IN LIGHT OF THE LEGISLATIVE INTENT

We are persuaded that the legislature intended the EPA to undertake rapid and comprehensive measures in coping with the problem of unsafe drinking water. It seems particularly clear from the legislative history that Congress contemplated prompt regulation, whenever feasible, of every contaminant identified as possibly injurious to health.

While the urgency of the legislature's plan is undeniable, a second aspect of its plan, of perhaps equal importance, is apparent. Regulation in this area, to proceed most efficiently, must remain attuned to our rapidly expanding knowledge and technology. The phased structure of the statutory scheme wisely reflects such an awareness. Heavy investment in measures of uncertain value may prove costly not only in financial terms but also, and more importantly, on a human scale. It would be simplistic to read the legislative will as mandating an undifferentiated and full-scale commitment of resources to programs based entirely on the present state of our knowledge. We do not understand petitioners to adopt such a position.

The notion of attuning national efforts to the progressive development of our capabilities in this area has reverberations, we think, for the proper role of the judiciary in a dispute such as the one before us. In our response to the challenge directed against administrative action, we must be wary lest our interim adjudications hinder pursuit of the legislative goals. In circumstances such as confront us here, judicial efforts may be

---

23. *Id.* at 8; U.S.Code Cong. & Admin.News 1974, p. 6461.

24. *Id.* at 10; U.S.Code Cong. & Admin.News 1974, p. 6463 (emphasis in original).

more profitably expended in assuring that future agency action will effectively promote the goals of the legislature than in fashioning remedies to "correct" earlier agency missteps.

With these thoughts in mind, we proceed to examine the challenged regulations.

## A. Regulation of Organics

■ As we have indicated above, we believe the legislature contemplated that the interim regulations would, where feasible, control every contaminant that may prove injurious to health. The failure of the challenged regulations to do so thus becomes suspect. In light of the clear language of the legislative history, the incomplete state of our knowledge regarding the health effects of certain contaminants and the imperfect nature of the available measurement and treatment techniques cannot serve as justification for delay in controlling contaminants that may be harmful.

There is ample evidence establishing the fact that our drinking water is contaminated with a large variety of organic substances, of demonstrated carcinogenicity in animals.[25] Most of these substances are not controlled under the interim regulations. Methods of monitoring the total organic content of water are available[26] and, while not perfect, they make possible the exercise of significant control over the drinking water content of a wide range of organic substances. The argument of the EPA that the use of such imperfect measures may lead to a false sense of security[27] cannot be accepted in light of the clear language in the House Report requiring prompt action despite defects in our monitoring capabilities. Finally, there is material in the record before us to indicate that feasible methods for lowering the level of organic contaminants in drinking water may be available[28] at a reasonable cost.[29] This would of course be a matter for EPA determination in the first instance, but the EPA has not stated that its course has been based on a contrary assumption.

While there is therefore serious question whether the EPA's failure to control total organics in the interim regulations has been responsive to the statute's provisions, we defer final resolution of this question. Considerations already identified suggest the wisdom of this course of action. During the pendency of this litigation, information bearing upon the problem of organic contaminants in drinking water has continued to accumulate. The National Academy of Sciences has submitted to Congress a report of its study of contaminants in drinking water,[30] undertaken pursuant to section

**25.** An example of unusual current concern is chloroform. The National Organics Reconnaissance Survey, initiated by the EPA in 1974 to determine the extent to which organics were present in the nation's drinking water, revealed, inter alia, that chloroform was present in the drinking water of each of the 80 cities studied. Chloroform is carcinogenic in laboratory animals. Report on the Carcinogenesis Bioassay of Chloroform, Division of Cancer Cause and Prevention, National Cancer Institute, Mar. 1, 1976. Chloroform is not controlled under the interim regulations.

**26.** The carbon chloroform extract (CCE) test procedure, which was the recommended standard for organic chemicals under the 1962 Public Health Service Drinking Water Standards, measures the total level of organic substances in drinking water, without identifying the individual component substances. While it may not detect all organics, it has the practical advantage of obviating the need to measure each substance individually, while providing a gross measure of the total organic content of

water. See Drinking Water Standards: Report of the EPA Advisory Committee on the Revision and Application of the Drinking Water Standards (1973).

**27.** Brief for Respondent at 26.

**28.** See Evaluation of Activated Carbon as a Drinking Water Treatment Unit Process, EPA, Mar. 3, 1975.

**29.** See Draft Interim Treatment Guide for the Control of Chloroform and other Trihalomethanes, EPA Water Supply Research Division, April, 1976 at 28.

**30.** Drinking Water and Health, Report to Congress of Recommendations of the National Academy of Sciences (June 20, 1977), summarized in 42 F.R. 35764 (July 11, 1977). The report lists 20 organic substances found in drinking water that are known to have, or are suspected of having, carcinogenic properties in man or animals. 42 F.R. at 35776, Table 1. Of

1412(e) of the Act.[31] The EPA has solicited views and data concerning the control of organic contaminants in drinking water, preparatory to considering amendment of the interim regulations.[32] These are but two examples of potential new sources of data that may aid the agency in reformulating its present approach to contaminants so as to keep pace with scientific and technological developments.

Congress has authorized the appellate courts to adopt such procedure, including orders of remand and requirement of further proceedings, "as may be just under the circumstances."[33] In cases like this, the court of appellate jurisdiction has been given authority to review actions of agencies in order to assure adherence to legislative mandate and furtherance of the legislative will. In our view, it would not be consistent with sound procedure, and hence would not be just to all concerned in the circumstances, to insist on agency application of resources and effort to reconsideration or revision of the interim regulations, as if that were the only process before the agency. The statute itself delineates an ongoing process, and we are informed of the potential of agency revision of its interim regulations. The court cannot wear blinders in a litigation involving an ongoing administrative process, and its rulings and relief must take account of the world as it exists as of the time of the decree.

■ In furtherance of our function and responsibility, we remand the record with a request to EPA to report to this court within 60 days regarding significant changes that have occurred, since the promulgation of the interim regulations, in its assessment of the problem of controlling organic contaminants in drinking water, and to advise the court of its determinations—as of the time of the report—as to whether it plans to propose amended interim regulations in light of newly acquired data.

### B. Regulation of Inorganic Substances

We find the dispute concerning the EPA's handling of inorganic contaminants susceptible of more definitive resolution at this time. This issue is not characterized by the extremely rapid scientific and technological development that give a special dimension to the problem of organics. Current knowledge of injurious effects is more well-developed and stable. The costs and efficacy of monitoring and treatment procedures are similarly more well established.

The task of the agency here is largely one of line drawing. Agency expertise and judgment must be applied in determining the optimal balance between promotion of the public welfare and avoidance of unnecessary expense. We will not interfere so long as the agency strikes a balance that reasonable promotes the legislative purpose.

Applying this standard we find that the challenged actions concerning the regulation of inorganic substances fall within the limits of discretion delegated to the agency under the Act, and reasonably promote the legislative intent. Our views may be summarized briefly.

■ *1. Fluoride*: The interim regulations permit fluoride levels to reach twice the optimal level for protection against dental caries. The EDF accepts that these levels may exceed the optimal therapeutic level, but argues that the MCL should be set at 1.5 times the optimal therapeutic

these, only two (Lindane and Endrin) are controlled under the interim regulations. The report stresses the applicability of findings in animal studies to man. *Id.* at 35776.

31. 42 U.S.C. § 300g–1(e).

32. Advance Notice of Proposed Rulemaking, 41 F.R. 28991 (July 14, 1976).

33. Although 28 U.S.C. § 2106 in terms applies to review of court orders, it has been understood to identify a general principle of appellate review that is applicable to review of agency orders and regulations, particularly when applied so as to permit enlightenment as to agency reasoning without undue intrusiveness. *See Greater Boston Television Corp. v. FCC*, 149 U.S.App.D.C. 322, 331, 463 F.2d 268, 277 (1971); *International Harvester v. Ruckelshaus*, 155 U.S.App.D.C. 411, 445, 478 F.2d 615, 649 (1973); *Natural Resources Defense Council v. Train*, 166 U.S.App.D.C. 312, 334 & n.112, 510 F.2d 692, 714 & n.112 (1974).

level.[34] The cosmetically undesirable mottling of the tooth enamel that results from excessive fluoride occurs in a severity proportional to the concentration of fluoride in the drinking water.[35] Nevertheless, because of the expense of removing fluoride from drinking water in areas where it occurs naturally in high concentration,[36] some determination must be made of the level beyond which it is not feasible to require a further reduction of fluoride. The parties both recognize that there has been considerable controversy as to what this level should be.[37] No evidence has been introduced that demonstrates that the level chosen by the EPA for the interim regulations fails to protect the public health to the extent feasible. We must conclude that the balance struck by the agency is well within its discretion under the Act.

■ *2. Sodium and sulfates* : The EPA did not promulgate interim regulations covering sodium and sulfates. The record before us does not require, as a matter of law, that the agency find that these substances, in the concentrations found in drinking water, have a significant impact on the health of most individuals. As has already been noted, the response of those who are affected varies considerably from one individual to the next. The decision not to impose MCL's for sodium and sulfates comports with these considerations, and is consonant with the views of the EPA Advisory Committee on the Revision and Application of the Drinking Water Standards, and of the National Drinking Water Advisory Council.[38]

The EDF does not object to the EPA's failure to set MCL's for sodium and sulfates, but only to its failure to require monitoring of these substances and notice to customers when certain levels are exceeded.[39] EDF finds authority for requir-

**34.** EDF does not propose in its brief a specific MCL for fluoride, but in commenting on the proposed interim regulations it argued in favor of the 1.5 figure. Comments by the Environmental Defense Fund on the Environmental Protection Agency's Proposed Interim Primary Drinking Water Standards at 12–13 (May 1975).

**35.** There is serious question as to whether mottling can be regarded as an "adverse effect on health" within the meaning of the Act. *See, e. g.,* HEW letter of June 4, 1973, to EPA at 2. "We believe that in the context of discussing limits to avoid concentrations of substances that may be hazardous to health, dental fluorosis should not be termed harmful. The more severe dental fluorosis caused by highly excessive concentrations is described in the literature as unesthetic, cosmetically objectionable, or disfiguring, but is not described as hazardous to health." (The letter is reproduced in Comments by the Environmental Defense Fund on the Environmental Protection Agency's Proposed Interim Primary Drinking Water Standards (hereinafter cited as EDF Comments), App.Tab E, Att. 5).

**36.** Where fluoride is *added* to drinking water to achieve therapeutic levels, its concentration is, of course, more easily controlled.

**37.** Brief for the Respondent at 32; EDF Comments at 12, App.Tab E. The 1962 Public Health Service Drinking Water Standards recommended limiting fluoride to two times the optimal therapeutic level. In 1967, the Preventive Practices Branch of the Division of Dental

Health of the Public Health Service recommended to the EPA that the limit be reduced to 1.5 times the optimal therapeutic level. Letter of Aug. 22, 1967, from the Acting Director, Division of Dental Health (reproduced in EDF Comments, App.Tab E, Att. 1). In March 1975, HEW determined that the studies upon which the 1967 recommendation was based were inadequate, and recommended to the EPA a level of two times the optimal therapeutic level. Letter of Mar. 7, 1975, from the Director of the Office of Environmental Affairs of HEW (reproduced in EDF Comments, App.Tab J).

**38.** The EPA Advisory Committee recommended notification to physicians of sodium levels, but not the establishment of an MCL. 1973 EPA Advisory Committee Report at 26, App.Tab H. Concerning sulfates, the EPA Advisory Committee did recommend that a maximum level be established. *Id.* at 27 (referring to bad taste, and the "discomfort" caused by the laxative effect). The National Drinking Water Advisory Council recommended monitoring of sodium and sulfates, and public notification, but no MCL's. Letter of Aug. 14, 1975 from C. C. Johnson to Russell Train, App.Tab I.

**39.** "If public water utilities were required to monitor and notify users that excessive levels of sodium or sulfates were present in drinking water, the public notification requirements of the Act would be satisfied and that segment of the population which all parties agree are at risk could be protected while data is accumulated to support a maximum contaminant level

ing such monitoring and notification in sections 1412(a)(2),[40] 1445(a),[41] and 1450(a)(1) [42] of the Act, the provisions of which are noted in the margin.

■ Given the deference that the Supreme Court has proclaimed is due on the part of a court to the agency charged with putting a new statute in motion,[43] we are in no position to say that the EPA has violated the statute by its failure to establish monitoring and notification requirements in the interim regulations. Section 1445(a) [44] authorizes EPA to require water suppliers to monitor supplies for the purpose of aiding the Administrator in establishing regulations. It is for the EPA to consider, at least in the first instance, whether such monitoring may be established for the purpose of advice to the public, and whether in any event monitoring can be required in the absence of regulations specifying MCL's or treatment techniques, and whether any monitoring reports made to EPA must or should be available to the public, under the Freedom of Information Act or otherwise. An agency such as EPA is confronted with a host of complex and difficult questions all at one time; an attempt to tackle them holus-bolus may be unfeasible and counterproductive. Only where a statutory direction is clear is a court warranted in issuing a mandate directing it to take particular actions.

adequate to protect the general population." Brief for petitioner at 63.

**40.** 42 U.S.C. § 300g–1(a)(2), which provides that the interim regulations "shall protect health to the extent feasible, using technology, treatment techniques, and other means . . generally available . . . on the date of enactment of this title."

**41.** 42 U.S.C. § 300j–4(a), which provides that water suppliers "shall . . . conduct such monitoring, and provide such information as the Administrator may reasonably require . . to assist him in establishing regulations under this title."

**42.** 42 U.S.C. § 300j–9(a)(1), which authorizes the Administrator "to prescribe such regulations as are necessary or appropriate to carry out his functions under this title."

■ Section 1450(a)(1) [45] constitutes a general authorization for the Administrator to promulgate regulations necessary to his functions under the Act. Such language invests the agency with a latitude that is considerable [46] but not untrammeled. The matter of sodium and sulfates has not been swept aside. The study carried out by the National Academy of Sciences pursuant to section 1412(e) of the Act [47] has addressed the matter, and the report of its findings [48] may aid the agency in reevaluating its approach to these substances. The relief prayed by petitioners will not be granted.

*3. Lead and Cadmium:* The interim regulations set MCL's for both of these substances. EDF challenges the standards set by the regulations for monitoring the levels of these substances. Monitoring is required once a year for community water systems using surface water, and once every three years for systems using ground water. There is no requirement as to the number of, and locations at which, samples are to be taken. EDF appears to press for more frequent sampling, and for express requirements concerning the number of samples and times and locations at which samples are to be taken, so as to assure detection of harmful levels that may be present in only part of a particular system, or at only certain times.

■ As to frequency of sampling, the EPA stresses that the harmful effects of

**43.** *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), *Power Reactor Development Co. v. IUERMW,* 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

**44.** 42 U.S.C. § 300j–4.

**45.** 42 U.S.C. § 300j–9.

**46.** *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Niagara Mohawk Power Corp. v. FPC,* 126 U.S.App.D.C. 376, 381–82, 379 F.2d 153, 158–59 (1967).

**47.** See note 31 *supra.*

**48.** Summarized in 42 F.R. at 35772, 35774.

lead and cadmium in drinking water generally result from chronic exposure to the contaminants,[49] a point with which the EDF appears to agree.[50] EDF does not call our attention to any evidence that would indicate that the challenged sampling intervals are not sufficiently frequent to detect changes in contaminant levels before harm results. On this record, we cannot overturn the frequency established by the EPA as an abuse of discretion.

We turn to the issue of the samples to be taken within a given water supply system, their number, frequency and locations. Corrosion of supply pipes and plumbing fixtures concededly constitutes a significant source of lead and cadmium in drinking water.[51] Consequently, levels of these substances may vary, even within the same water supply system, depending upon variations in the corrosiveness of the water at different times, in the periods of time during which water remains in the pipes, and in the age and composition of the pipes in different parts of the system. It is possible that an annual sampling of water at a single location in a water supply system may fail to detect such variations—even for long periods of time.

Section 1401(1)(D) of the Act[52] states that primary drinking water regulations (i. e., interim and revised regulations), must contain "criteria and procedures to assure [compliance] with . . . maximum contaminant levels; including quality controls and testing procedures to insure compliance with such levels and to insure proper operation and maintenance of the system . . ." It is plausible to put it that Congress contemplated monitoring that will detect variations within a system.

However, considerations of feasibility must be weighed in determining the extent to which intra-system variations are unacceptable under the Act. The House Report explains that "[m]onitoring should insure *to the extent feasible* the detection of a violation before such violation causes or contributes to any adverse health effect."[53] While it can be argued that *all* water supply systems should be required to sample widely within the system, at specified locations and frequencies, such an approach might unnecessarily burden those systems for which intra-system variation is not a problem. The House Report suggests that monitoring requirements were intended to be more finely tuned:

> More frequent monitoring should be required by regulation for classes of systems facing local conditions which justify such increased monitoring. In prescribing regulations requiring more frequent monitoring or sampling than the minimum, the Administrator is expected to take into account, among other facts, the nature and type of the water source, historical data characterizing the water quality, anticipated variations in water quality, vulnerability of the source to accidental or deliberate contamination; the population at risk, the type of treatment provided, and the level of the contaminant which is generally found as it relates to the established limit.[54]

While this passage from the House Report speaks only of frequency of sampling, its approach seems equally applicable to other aspects of monitoring.

The degree to which monitoring requirements can be tailored to detect local variations in contaminant levels depends upon the access of the EPA to information concerning such variations. The EPA maintains that it did not have detailed information of this sort available at the time of promulgation of the interim regulations.[55] In an effort to obtain such data, it has

**49.** Brief for the Respondent at 49–50.

**50.** Brief for Petitioner at 65.

**51.** Brief for Petitioner at 65; Brief for the Respondent at 53.

**52.** 42 U.S.C. § 300f(1)(D).

**53.** House Report at 15; U.S.Code Cong. & Admin.News 1974 p. 6468.

**54.** *Id*; U.S.Code Cong. & Admin.News 1974, p. 6468.

**55.** Brief for the Respondent at 52.

encouraged the states to conduct sanitary surveys of water systems which would help to identify local drinking water problems.[56]

An agency has discretion in selecting the techniques appropriate for grappling with a problem and carrying out its functions.[57] We cannot at this point say that EPA's approach to the formulation of monitoring regulations is without a rational basis. As data accumulate on local variations in lead and cadmium levels, the agency will be in a position to formulate a more refined approach to monitoring—either by amending the interim regulations or by designing the revised and secondary regulations to reflect such local conditions. Should the agency fail to do so, we will have another case before us.

\* \* \* \* \* \*

Subsequent to the preparation of the foregoing, the EPA has initiated further regulation of organics in drinking water. Regulations proposed by the Agency on January 25, 1978, would limit the presence of trihalomethanes, including chloroform, to under 100 parts per billion in the drinking water of communities with a population of more than 75,000; and would require, in these communities, the application of a special purification technique—filtration by granular activated carbon—to the treatment plants of systems whose water sources are polluted. The presence of chloroform in drinking water has been of particular concern because of its demonstrated carcinogenicity in laboratory animals and widespread presence in municipal water systems. *See* note 25 *supra*.

\* \* \* \* \* \*

Insofar as the petition for review presents challenges as to inorganic contaminants, it is denied. As to the challenge to the regulation of organic contaminants, we remand the record for a report by the EPA, as set forth in this opinion.

*Affirmed.*

MacKINNON, Circuit Judge, concurring in part and dissenting in part: The majority opinion concludes with respect to *organics*:

In furtherance of our function and responsibility, we remand the record with a request to EPA to report to this court within 60 days regarding significant changes that have occurred, since the promulgation of the interim regulations, in its assessment of the problem of controlling organic contaminants in drinking water, and to advise the court of its determinations—as of the time of the report—as to whether it plans to propose amended interim regulations in light of newly acquired data.

188 U.S.App.D.C. at ——, 578 F.2d at 346. I concur in this part of the opinion. However, I dissent from the affirmance of the Agency's action with respect to lead and cadmium. The Agency defends its regulation by statistics that are based on *source water*, not on statistics gathered at the point of final distribution. It also relies on testimony that in my view is not sufficiently extensive, particularly in view of the fact that lead and cadmium pollution is admittedly caused by spotty factors, *i. e.*, somewhat by the type of conduits used in various locations and the corrosiveness of the water. The contentions of the Fund, in this respect, seem to me to be logical; and since they are not answered by the Agency, I would remand those portions of the regulations for more extensive testing and reconsideration in the light thereof.

With respect to the Agency's regulations on inorganic substances, I would uphold them, in the main, for the reasons outlined in the majority opinion, but I would not confine the study of fluoride to its dental effects when it is also suspect of causing some changes in bone density.

**56.** 40 C.F.R. § 141.2(f) (1976).

**57.** See *Mourning v. Family Publications Services, Inc.*, 411 U.S. 356, 371–72, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Philadelphia Television Broadcasting Co. v. F.C.C.*, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966).