# In re SURFACE MINING REGULATION LITIGATION.

## No. 78-162.

United States District Court,
District of Columbia.

Aug. 24, 1978.

**1306**

Lois J. Schiffer, Alfred T. Ghiorzi, David C. Cannon, Jr., Carol Green, Michael A. McCord, Land & Natural Resources Division, General Litigation Section, U. S. Dept. of Justice, Washington, D.C., for defendants.

Frank B. Friedman, Washington, D.C., Edgar H. Twine, Washington, D.C., for plaintiff Atlantic Richfield Co.

Warner W. Gardner, I. Michael Greenberger, Shea & Gardner, Washington, D.C., for plaintiff Peabody Coal Co.

Richard McMillian, Jr., John A. Macleod, Washington, D.C., for plaintiffs Amherst Coal Co., et al. and Consolidation Coal Co.

Francis J. McShalley, McGee & Ketcham, Washington, D.C., Thomas G. Johnson, S. S. Dur, Houston, Tex., for plaintiff R & F Coal Co.

John L. Hill, Atty. Gen. of Tex., P. M. Schenkkan, Sp. Asst. Atty. Gen., Austin, Tex., for plaintiff State of Texas.

Edward H. Forgotson, Dallas, Tex., Nicholas S. Reynolds, Washington, D.C., Spencer C. Relyea, Dallas, Tex., for plaintiff Texas Utilities Generating Co.

Peter J. Nickles, Eugene D. Gulland, Washington, D.C., for plaintiff Sunoco Energy Development Co., et al.

Roberts B. Owen, Robert N. Sayler, Theodore Voorhees, Jr., Robert J. Gage, Covington & Burling, Washington, D.C., for plaintiffs National Coal Association, et al.

Thomas L. Wylie, Senior Counsel, William L. Hynan, Senior Vice President, National Coal Association, Washington, D.C., for plaintiff National Coal Association.

Stuart T. Saunders, Jr., Washington, D.C., Rose, Schmidt, Dixon, Hasley & Whyte, Pittsburgh, Pa., for plaintiff Western Pennsylvania Surface Coal Mine Operators Association, et al.

W. Stanfield Johnson, Washington, D.C., for plaintiff Consolidation Coal Co., et al.

Charles F. Cook, Vice President, Edward M. Green, Senior Counsel, American Mining Congress, Anthony J. Thompson, Edward A. McCabe, Charles E. Sliter, Hamel, Park, McCabe & Saunders, Washington, D.C., for plaintiff American Mining Congress, et al.

John L. Kilcullen, Michael T. Heenan, Washington, D.C., for plaintiff Utah International Inc.

Michael Henke, Vinson & Elkins, Washington, D.C., Guy Nevill, Houston, Tex., for plaintiff Dow Chemical Co.

J. Thomas Steger, Asst. Atty. Gen., Marshall Coleman, Atty. Gen., Richmond, Va., for plaintiff State of Virginia.

Steven L. Friedman, John M. Elliott, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., Stuart P. Ross, Roger H. Trangsrud, Patrick M. Raher, Hogan & Hartson, Washington, D.C., for plaintiff Pennsylvania Coal Mining Association, et al.

Robert J. Golten, National Wildlife Federation, Charles E. Hill, Terence Thatcher, Institute for Public Interest, Georgetown University Law Center, Washington, D.C., L. Thomas Galloway, Center for Law and Social Policy, Washington, D.C., for plaintiff, defendant-intervenor National Wildlife Federation, et al.

Chauncey H. Browning, Jr., Atty. Gen., Dennis Abrams, Asst. Atty. Gen., Charleston, W.Va., for plaintiff State of West Virginia.

William I. Althen, Robert J. Coyne, Washington, D.C., for plaintiff Virginia Surface Mining & Reclamation Association, Inc. et al.

## MEMORANDUM OPINION AND ORDER

FLANNERY, District Judge.

This matter comes before the court on plaintiffs' motions for summary judgment. This action involves twenty-four consolidated cases attacking interim regulations promulgated pursuant to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.* The facts underlying these actions and the regulations are fully set forth in this court's Memorandum Opinion and Order of May 3, 1978 which considered plaintiffs' motions for a preliminary injunction and their initial motions for summary judgment. 452 F.Supp. 327 (D.D.C. 1978).

### I. *Preliminary and Procedural Issues.*

■ A number of issues need to be resolved before plaintiffs' substantive challenges may be considered.[1] Review of agency rulemaking is limited by statute to this court and review must be sought within 60 days of agency action. 30 U.S.C. § 1276(a)(1). Certain plaintiffs are concerned about the possibility of "unpredictable applications" of the regulations in the future after this action has ended, which would be beyond 60 days after the promulgation of the rules. Review of application of the regulations is limited by statute to the district courts for the district "in which the surface coal mining operation is located." *See* 30 U.S.C. § 1276(a)(1). Thus, it would not be appropriate for this court to comment on any possible unpredictable applications.

■ National Coal Association (NCA) and others again raise procedural issues already addressed by this court in its previous opinion. 452 F.Supp. at 332–333.[2] These plaintiffs have not presented any arguments that would persuade the court to reconsider its earlier decision. NCA also asserts that its previous contentions are supported by a memorandum prepared by an attorney for the Interior Department

---

1. Several issues raised by the plaintiffs were resolved upon consideration of the government's response and thus no longer require action by this court. These issues include issues before the Secretary of Interior on motions for reconsideration, topsoil handling, prevention of erosion, compulsory use of mulch, and discharge of water underground.

2. NCA also incorporates in its memorandum in support of its motion arguments contained in an appendix to one of its earlier briefs. Many of the issues addressed in the appendix have already been considered by this court and need not be reconsidered. The issues already decided include the regulation of underground mining, the regulation of dams impounding waste, citations to technical data supporting the regulations and the index to the administrative record, and general attacks on the basis and purpose statement accompanying the regulations. 452 F.Supp. at 333, 334–336, 341; CA 78–162, at 2–6 (D.D.C. April 18, 1978). In regard to the more particularized challenges to the basis and purpose statement, the statement's discussion of the various regulations attacked is sufficient. *See* 42 Fed.Reg. 62646–48 (disposal of spoil), 62661 (prime farmlands) (Dec. 13, 1977). NCA's substantive attacks on some of the provisions will be discussed in greater detail along with other challenges to the regulations. These provisions include the dam freeboard requirement, the prime farmlands historical use clause, and regulation of valley or head-of-hollow fills.

that was made available to it by an unidentified employee of the Department of Interior. Putting aside questions of relevance, privilege, and propriety, the memo adds nothing to the plaintiffs' position. The memorandum discusses procedures and requirements for normal agency rulemaking. As this court indicated previously, given the statutory time constraints which required expedited rulemaking in this case, the procedures employed by the Secretary and the basis and purpose statement accompanying the regulations were reasonable and adequate. *See Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 327, 486 F.2d 375, 394 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *Kennecott Copper Corp. v. EPA,* 149 U.S. App.D.C. 231, 234–35, 462 F.2d 846, 849–50 (1972); *cf. EDF, Inc. v. Costle,* 578 F.2d 337 (D.C. Cir. 1978).

■■■ Plaintiff Peabody Coal Co. generally challenges the interim program's use of design criteria rather than performance standards. *See, e. g.,* §§ 715.14(b)(2), 715.-14(c), 715.15(b)(5)–(9), (11), 42 Fed.Reg. 62681–84 (Dec. 13, 1977). Peabody contends that the Act only authorizes the use of design criteria in the regulation of waste dams. 30 U.S.C. §§ 1265(b)(13), 1265(f). Section 201(c)(2) of the Act, however, gives the Secretary broad discretion to promulgate "such rules and regulations as may be necessary to carry out the purposes and provisions of this chapter." 30 U.S.C. § 1211(c)(2).[3] Furthermore, the legislative history of the Act reveals that Congress clearly intended detailed regulations, such

as design criteria. *See* H.R.Rep.No.95–218, 95th Cong., 1st Sess. 85, *reprinted in* [1977] U.S.Code Cong. & Admin.News pp. 593, 622. Many of the environmental problems created by surface mining are better regulated through design criteria rather than performance standards and Congress left the decision as to the manner of regulation to the Secretary. To the extent that Peabody challenges the use of uniform nationwide standards, this argument has already been rejected when the plaintiffs' claim that adequate variance procedures were lacking was denied. 452 F.Supp. at 338–339; *see* 123 Cong.Rec. H3732 (daily ed. April 28, 1977) (remarks of Rep. Udall); 123 Cong.Rec. S7890 (daily ed. May 18, 1977) (remarks of Sen. Metcalf). Peabody also claims that the regulations create an impermissible irrebuttable presumption that the "failure to meet the design criteria automatically amounts to a failure to meet the performance objectives of the Act." This contention is totally without merit. The regulations properly implement the Act and enforcement of the provisions of the regulations will not create any impermissible irrebuttable presumptions.

■■■ The final preliminary issue concerns a disagreement over the standard of review to be applied by this court. Section 526(a)(1) of the Act provides that "Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law." 30 U.S.C. § 1276(a)(1). The disagreement stems from the language in

---

**3.** The relevant statutory scheme in this case is unlike the one the Supreme Court faced under the Clean Air Act in *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 569–71, 54 L.Ed.2d 538 (1978). The Court in that case was confronted with a criminal conviction for violation of emission standards promulgated under the Clean Air Act by the Administrator of the Environmental Protection Agency. *Id.* The Supreme Court held that "Congress intended, within broad limits, that 'emission standards' be regulations of a certain type . . .'." 98 S.Ct. at 572. The regulatory scheme under the Clean Air Act has different types of regulations such as "work practice standards" and "emission standards" with dif-

fering criminal and civil enforcement provisions. *Id.* at 570–75. The Surface Mining Control and Reclamation Act does not provide for different types of regulations with differing criminal and civil enforcement provisions. Thus, the situation presented in this case is unlike the scheme in *Adamo Wrecking Co.* where a distinction between "emission standards and the techniques to be utilized in achieving those standards" was envisioned. 98 S.Ct. at 573. In the Surface Mining Control and Reclamation Act Congress did not limit the Secretary's authority with respect to whether the regulations contained performance standards or design criteria.

§ 526(b) which provides "Except as provided in subsection (a) of this section, the findings of the Secretary if supported by substantial evidence on the record as a whole, shall be conclusive." 30 U.S.C. § 1276(b). By its terms, the "substantial evidence" test of § 526(b) does not apply to this review of the regulations under § 526(a) and it evidently refers to judicial review of administrative adjudicatory proceedings under § 526(a)(2), which expressly incorporates the standards of § 526(b). 30 U.S.C. § 1276(a)(2); see H.R.Rep.No.95–493, 95th Cong., 1st Sess. 111 (1977); U.S.Code Cong. & Admin.News 1977 p. 593. The fact that the statutory substantial evidence test does not apply to the regulations in this case does not relieve the defendant of all responsibility to establish support for the regulations in the administrative record. Under the arbitrary and capricious standard, the Secretary still must show support for the regulations in the basis and purpose statement or the administrative record. *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 700–701 (2 Cir. 1975); see *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); W. Rodgers, *Environmental Law* § 15, at 19 (1977). This support, however, need not show to a certainty that the regulations adopted by the Secretary are necessarily the best or the only possible method of regulation. See *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 401 & n. 58, 541 F.2d 1, 28 & n. 58 *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 175, 180–181, 501 F.2d 722, 735, 740–41 (1974); *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 338–39, 499 F.2d 467, 474–75 (1974). The Secretary still retains the broad discretion necessary to make policy judgments, especially in areas of environmental law such as the one presently before the court, where all the relevant data may not yet be available and the possibility of irreparable environmental harm exists. See *Ethyl Corp., supra*, 176

U.S.App.D.C. at 401 & n. 58, 541 F.2d at 28 & n. 58; *Amoco Oil Co., supra*, 163 U.S.App. D.C. at 175, 180–181, 501 F.2d at 735, 740–41; *Industrial Union Department, AFL–CIO, supra*, 162 U.S.App.D.C. at 338–39, 499 F.2d at 474–75. Furthermore, in implementing a new statute, an agency's reasonable interpretation of the Act is entitled to deference from the reviewing court. See *E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 134–35, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *Train v. NRDC, Inc.*, 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1974); *EDF, Inc. v. Costle*, 578 F.2d 337 (D.C. Cir. 1978). With these considerations in mind, the court will proceed to the substantive review of the regulations.

## II. *Substantive Issues.*

### A. *Spoil and Soil.*

 The industry plaintiffs challenge several provisions of the regulations which control the disposal of spoil and the handling of soil. Sections 715.14(b)(2) and 715.-15(a)(7) of the regulations [4] limit the use of terraces in postmining reclamation and establish design criteria for their use. Under the regulations, the regulatory authority must approve the use of terraces. The regulations do not prohibit terracing; they merely provide for oversight by the regulatory authority in the use of terraces. The plaintiffs' basic assertion is that this control over terracing is improper. It appears, however, that the regulation of terracing is proper and a reasonable implementation of Congress' command that the operators "restore the approximate original contour of the land." 30 U.S.C. § 1265(b)(3); see 30 U.S.C. § 1291(2). Furthermore, the Secretary adequately explained the reasons for the provisions of the regulations. 42 Fed. Reg. 62644–45, 62646 (Dec. 13, 1977).

 Plaintiffs' next attack is directed at sections 714.14(j) and 715.17(g) of the regulations which provide that toxic, acid-forming, and combustible materials:

---

4. When published in the Code of Federal Regulations, the sections of the regulations may be found at 30 C.F.R. § 700 *et seq.* Presently, the regulations may be found at 42 Fed.Reg. 62675–62716 (Dec. 13, 1977).

shall be covered with a minimum of 4 feet of nontoxic and noncombustible material; or, if necessary, treated to neutralize toxicity in order to prevent water pollution and sustained combustion, and to minimize adverse effects on plant growth and land uses.

42 Fed.Reg. 62683, 62686 (Dec. 13, 1977). Plaintiffs contend that this requirement is arbitrary, capricious and lacks adequate support in the basis and purpose statement and the administrative record. The plaintiffs focus their attack on the four feet of cover requirement and virtually ignore the treatment alternative provided by the regulations. The basis and purpose statement clearly provides that "Materials that are adequately treated need not be buried." 42 Fed.Reg. 62645 (Dec. 13, 1977); see 42 Fed. Reg. 62655. The Secretary also has indicated that a combination of treatment and cover may be used to reduce the four feet of cover requirement. The administrative record reveals that the commentators were divided with respect to the amount of cover that is necessary to prevent water pollution. The record indicates that the Secretary exercised his discretion in a reasonable manner in making a sound policy judgment based on conflicting recommendations and data. The Secretary fully explained the reasons for his action in the basis and purpose statement. 42 Fed.Reg. 62645–46, 62655 (Dec. 13, 1977). Therefore, this court cannot conclude that the regulations are arbitrary, capricious or that they lack adequate support in the administrative record and the basis and purpose statement.

 Plaintiffs attack several provisions that regulate the use of valley and head-of-hollow fills for spoil disposal. The State of West Virginia challenges the design and construction criteria of § 715.15(b) of the regulations in general as being arbitrary, capricious and inconsistent with law. In essence, West Virginia raises the same objections concerning the use of design criteria that Peabody Coal Co. employed in its attack on the utilization of design criteria throughout the regulations. The court's discussion, supra, in reference to Peabody's argument is equally applicable here. To the extent that West Virginia contends that the valley and head-of-hollow fill regulations lack adequate variance procedures, this claim also has been previously rejected by this court with respect to the regulations as a whole. 452 F.Supp. at 338–339. The court can only reiterate its holding that "Throughout the Act Congress made it clear that the only alternative that the operators had was to comply or not conduct operations." Id. at 338–339. West Virginia also contends that the basis and purpose statement is inadequate in reference to § 715.15(b). It is readily apparent, however, that the Secretary reached a reasoned result and adequately explained his decision. 42 Fed.Reg. 62646–48 (Dec. 13, 1977). Finally, the state also challenges the record support for the regulations. In this regard, West Virginia has filed a motion to supplement the record, or in the alternative, to lodge a relevant document with the court.

In the basis and purpose statement, in support of § 715.15(b), the Secretary stated "The regulations are adequately supported by ongoing studies." 42 Fed.Reg. 62647 (Dec. 13, 1977). West Virginia contends that only one document listed in the certified index to the administrative record filed in March can be characterized as an "ongoing study." The study referred to is a 1977 interim report concerning valley and head-of-hollow fills prepared by the consulting firm of Skelly and Loy. See Skelly & Loy, Environmental Assessment of Surface Mining Methods, Head-of-Hollow Fill and Mountain Removal, Interim Report (1977). West Virginia first asserts that the interim study does not support the regulation. In addition to being conclusory, West Virginia's contentions concerning the study, and the administrative record as a whole, are insufficient for the court to find the Secretary's action arbitrary, capricious, or inconsistent with law. In its motion to supplement the record, supported by Consolidation Coal Co., West Virginia also asserts that a March, 1978 update to the 1977 report prepared by the same firm undermines the Secretary's decision concerning design criteria. See Skelly & Loy, Environmental As-

sessment of Surface Mining Methods, Head-of-Hollow Fill and Mountaintop Removal, Interim Report (March 1978). As this court held in an earlier opinion, "this court's review of the regulations in question is limited by statute, to the administrative record 'made before the Secretary' and the court has no authority to allow a new record to be developed." CA 78–162, Mem.Op. at 1 (D.D.C. April 18, 1978); see 30 U.S.C. § 1276(b). Therefore, the court cannot consider the 1978 report in its review of the regulations because it is not part of the record made before the Secretary.

The situation presently before this court, however, is similar to the one that faced the United States Court of Appeals for the District of Columbia Circuit in *EDF, Inc. v. Costle*, 578 F.2d 337 (D.C.Cir. Feb. 10, 1978). There the Environmental Protection Agency had promulgated interim regulations which were under attack, when a report prepared by the National Academy of Sciences for Congress brought into question the sufficiency of the regulations. 578 F.2d at 345. The Court of Appeals did not utilize the new data in reviewing the regulations, but instead remanded the regulations to the agency to assess the new findings and consider possible amendments to the regulations. 578 F.2d at 344–345. Similarly, this court will leave § 715.15(b) in force, but remand the regulations to the Secretary for reconsideration in light of the March 1978 report. *See EDF, Inc., supra*, 578 F.2d at 345.[5] The Secretary shall file a report with the court concerning his reconsideration of the regulation within 60 days of the date of this opinion. The court will not enjoin the operation and enforcement of the regulation because of its finding that the regulation was reasonable and supported by

the record and because of the possibility of injury to the environment and the public health and safety if the operations in question were to go unregulated. The additional costs that the industry plaintiffs will have incurred if the regulation is later amended are minute when compared to the possible harm that might result. In accordance with this holding, the court will deny West Virginia's motion to supplement the record, or in the alternative, to lodge a relevant document with the court.

Industry plaintiffs challenge two specific provisions of § 715.15 concerning underdrains and the compaction of spoil in valley fills. *See* §§ 715.15(b)(6), (7), 42 Fed. Reg. 62684 (Dec. 13, 1977).[6] Section 715.-15(b)(6) sets certain requirements for rock underdrains that must be constructed in valley and head-of-hollow fills. It is the design criteria for the underdrains that are being challenged. Plaintiffs contend that the criteria are arbitrary and capricious and lack adequate support in the basis and purpose statement and the administrative record. It is readily apparent, however, that the Secretary's action was reasonable and adequately supported by the basis and purpose statement and the administrative record. It is clear from the arguments of both sides that precise standards that completely ensure safe[7] valley fills are not yet available. In regulating underdrains, it appears that the Secretary was concerned with imposing minimum standards that provide an extra margin of safety. *See* 42 Fed.Reg. 62646–47 (Dec. 13, 1977). Although safe underdrains may in some instances be constructed to specifications below those set by the Secretary, the Secretary's action in promulgating these minimum standards was

---

**5.** Although the Court of Appeals founded its authority to remand the regulations to the EPA on 28 U.S.C. § 2106, which only sets forth the powers of appellate courts, this court may remand the regulation in question here under § 526(b) of the Act. 30 U.S.C. § 1276(b). *See EDF, Inc., supra*, 578 F.2d at 346 & n. 33.

**6.** The industry plaintiffs also question the use of design criteria in the valley fill regulations. The operators allege that the Secretary's limiting of their discretion with respect to these two

variables in valley fill construction was impermissible. The plaintiffs have failed to show, however, that the Secretary's action in imposing minimum safety standards with respect to the two variables was arbitrary, capricious, or inconsistent with law.

**7.** The court's references to safety throughout this opinion include considerations of protection of the environment and the public's health and welfare.

not arbitrary or capricious. Furthermore, the provisions of the regulation are adequately supported by the basis and purpose statement and the administrative record. See Fed.Reg. 62646–47; Skelly & Loy, supra, at I–5, II–4, VII–7, –44, –53 (1977). Therefore, § 715.15(b)(6) of the regulations will be upheld. The regulation will be reconsidered, however, pursuant to this court's remand for review in light of the recent Skelly & Loy report.

Section 715.15(b)(7) of the regulations requires the compaction of spoil to be used in valley fills "in lifts that are less than four feet thick." The plaintiffs claim that this requirement is arbitrary and capricious and lacks adequate support in the basis and purpose statement and the record.[8] The regulation of spoil compaction is adequately supported by the statute, the basis and purpose statement, and the administrative record. 30 U.S.C. §§ 1265(b)(3), (10); 42 Fed. Reg. 62646–47 (Dec. 13, 1977); Skelly & Loy, supra, at VII–42 (1977); see H.R.Rep. No.95–218, 95th Cong., 1st Sess. 101, reprinted in [1977] U.S.Code Cong. & Admin. News. pp. 593, 634. Moreover, the specific four foot requirement is supported by § 10.5 of West Virginia's regulations and the Grim study. See Grim, Environmental Protection in Surface Mining of Coal 61 (1974). Section 715.15(b)(7), like § 715.15(b)(6), will be reconsidered along with all of the provisions of § 715.15(b) upon remand for review in light of the March, 1978 Skelly & Loy report, supra. In reviewing § 715.15(b)(7), the Secretary should also take into account the fact that West Virginia, in a proposed amendment to its regulations, is considering allowing variances from the four-foot lift requirement. Furthermore, the Secretary should disclose the substance of the consultations that the Department had with "those who have made studies of head-of-hollow fills" that are referred to in the basis and purpose statement. 42 Fed.Reg. 62646; see United States v. Nova Scotia Food Products Corp., 568 F.2d 240, 252 (2nd Cir. 1977). The Secretary also should allow interested parties to comment on the substance of the consultations and these comments should be considered in the review of the regulation.

■ The National Coal Association and others generally attack the prime farmlands regulations. The only challenge specific enough to warrant discussion concerns the historical use clause of § 716.7(a)(1). Section 716.7(a)(1) defines prime farmlands, in part, as lands which "have been used for the production of cultivated crops . . . for at least 5 years out of the 20 years preceding the date of the permit application." The explanation given by the Secretary for this clause, which was not included in the basis and purpose statement, was that the 5 out of 20 requirement was necessary in order to include lands used for cultivation in a long-term rotation (i. e. lands only used once every four years). In addition to the Secretary's failure to point to support for this standard in the basis and purpose statement or the administrative record, the regulation is clearly overbroad in achieving its stated purpose. As the plaintiffs note, the regulation draws into its coverage lands that have not been farmed for 15 years prior to the permit application, but were farmed for the 5 years before the period of idleness. Because of the lack of explanation or support, and the fact that the definition is too broad for the purpose now given, use of the definition in the historical use clause of § 716.7(a)(1) by the Secretary will be enjoined and the regulation remanded to the Secretary for reconsideration.

■ Finally with respect to spoil and soil, the plaintiffs challenge the application of standards from some of the provisions discussed above (i. e., § 715.15(b)(6) (valley fill underdrains), § 715.15(b)(7) (compaction of spoil), § 715.14(j)(1) (cover of toxic material)) to underground mines in sections 717.-14, 717.15 and 717.17. Plaintiffs' argument

---

8. In their discussion concerning the compaction of spoil into lifts that are less than four feet thick, the plaintiffs also contend that the definition of valley and head-of-hollow fills is arbitrary and capricious. See §§ 710.5, 715.-15(a)(8). The plaintiffs have failed, however, to adequately demonstrate that the definition is arbitrary and capricious.

that the standards incorporated are invalid must be rejected in accordance with this court's discussion of the specific provisions, *supra.* Plaintiffs assertions that the regulations concerning underground mines are unexplained and unsupported and fail to take into account the distinct differences between surface and underground mining must also be rejected. Support for the specific standards has been discussed, *supra,* and was found to be adequate.. With respect to the application of the standards to underground mining, the Secretary's action is explained in the basis and purpose statement. 42 Fed.Reg. 62662–63 (Dec. 13, 1977). The Secretary also considered the distinct differences between surface and underground mining in the regulations and explained the differing standards in the preamble to the regulations. *See* § 717, 42 Fed.Reg. 62695–62700; 42 Fed.Reg. 62662–63 (basis and purpose statement). Therefore, the Secretary's action will be upheld.

## B. *Reclamation.*

 Peabody Coal Company challenges § 715.13(b)(2) which requires the restoration of lands disturbed by surface mining to the "premining use of surrounding lands that have received proper management" where the disturbed lands were improperly managed prior to mining.[9] Peabody contends that the regulation goes too far in requiring restoration that improves the capability of the land beyond the state it was in prior to mining. Peabody insists that the standard is not supported by the Act and is unconstitutional. Contrary to Peabody's assertions, the regulation is fully supported by § 515(b)(2) of the Act which requires restoration "to a condition capable of supporting the uses which it was capable of supporting prior to any mining, or higher or better uses of which there is a reasonable likelihood . . . ." 30 U.S.C. § 1265(b)(2); *see* S.Rep.No.94–128, 95th Cong., 1st Sess. 76–

77 (1977); H.R.Rep.No.95–218, 95th Cong., 1st Sess. 93, *reprinted in* [1977] U.S.Code Cong. & Admin.News pp. 593, 630. The Act, its legislative history, and the regulation all speak in terms of capability rather than the actual state of the land prior to mining and the court cannot find that the standard is inconsistent with law. Moreover, the parties dispute appears to have been narrowed to questions of application that are better left for determination when the regulation is applied. The court also is of the opinion that it would be inappropriate for the court to rule on Peabody's constitutional claims under the Commerce Clause and the Due Process Clause, to the extent that they have not been withdrawn, in the absence of a concrete factual setting. *Diamond Shamrock Corp. v. Costle*, 188 U.S.App.D.C. ——, ——, 580 F.2d 670, 672–674 (1978); *see Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Therefore, § 715.13 will be upheld.

## C. *Hydrology.*

 The first issue raised by the plaintiffs concerning regulation of hydrologic functions is the definition of an aquifer in § 710.5. Although it appears that the challenge has been withdrawn because of the government's further interpretation of the definition, to the extent that the regulation remains under attack it will be upheld. Given the Secretary's interpretation of the definition in light of possible ambiguities, the plaintiffs have not established that the regulation is arbitrary, capricious, or inconsistent with law.

 The next issue concerns this court's preliminary injunction contained in the May 3, 1978 opinion and order which enjoined the enforcement of § 715.17(a) 452 F.Supp. at 343–344.[10] Section 715.17(a) was en-

---

9. Peabody also challenges an identical provision in the regulations covering Indian lands. 25 C.F.R. § 177.104(b).

10. "Although it was not explicitly stated in the court's order, the parties agree that the injunction also applied to the almost identical provi-

sions of § 717.17(a) which regulate the surface effects of underground mining." CA 78–162, at 1 (D.D.C. Aug. 9, 1978) (Memorandum Opinion & Order denying plaintiff Consolidation Coal Co.'s motion for a temporary restraining order).

joined to the extent that it "supersedes, amends, repeals and modifies the provisions of the Federal Water Pollution Control Act and its regulations." *Id.* at 347; *see* 30 U.S.C. § 1292(a). The plaintiffs now move for summary judgment and a remand of the regulations for reconsideration in light of this court's earlier opinion. The government claims that the court has read the Secretary's authority too narrowly and that the regulations are not inconsistent with the Federal Water Pollution Act (FWPCA). The court, however, did not unduly limit the Secretary's discretion. The court stated in its earlier opinion that the "Secretary has the authority to apply the standards of the FWPCA to the operators and to fill the gaps of the program with a more comprehensive regulatory scheme." 452 F.Supp. at 344. Thus, where the Secretary is regulating areas not covered by the FWPCA program, his discretion is not limited by § 702(a) of the Act. 30 U.S.C. § 1292(a). Where, however, the Secretary is regulating areas covered by the FWPCA regulatory program, the Secretary's program may not amend, modify, supersede or repeal any provisions of the FWPCA or its regulations.

■ The question then becomes the extent to which, if at all, the surface mining regulations improperly supersede, amend, repeal or modify the provisions of the FWPCA program. As the court noted in its earlier opinion, Amherst Coal Co. questions the effect of certain provisions' of § 715.17(a) on: 1) the variance procedure contained in the EPA's effluent limitation regulations for the coal mining point source category; 2) the exemption for unusual precipitation events in the same regulations and its effect on sedimentation pond design; and 3) the provisions for area wide waste treatment management of § 208 of the FWPCA, 33 U.S.C. § 1288. 452 F.Supp. at 344, n. 26. With respect to· the relationship between §§ 715.15(a) and 717.17(a) of the regulations and § 208 of the FWPCA, this court addressed the issue in its Memorandum Opinion and Order of August 9, 1978 denying plaintiff Consolidation Coal Co.'s motion for a temporary restraining order. The court hereby incorporates its findings and decision of August 9, 1978 into this memorandum opinion and order.

In the August 9, 1978 opinion the court found that because the EPA had no authority to regulate nonpoint source discharges under § 208 and the states had not yet acted, "This is precisely the type of situation envisioned by the Act where the Secretary of the Department of Interior would step in and regulate in order to prevent water pollution by the mining operations." CA 78–162, at 2 (D.D.C. Aug. 9, 1978); 30 U.S.C. §§ 1265(b)(10), 1292(a); *see* 452 F.Supp. at 344 (D.D.C. May 3, 1978). Thus, the court further found that although Congress left the regulation of certain areas of water pollution to the states under § 208, it "filled the ·gap with respect to surface mining and the surface effects of underground mining in the Surface Mining Control and Reclamation Act of 1977." CA 78–162, at 2 (D.D.C. Aug. 9, 1978); *see* W. Rodgers, *Environmental Law* § 4.4, at 375–86 (1977). Thus, the court cannot conclude that the requirements of §§ 715.17(a) and 717.17(a) repeal, amend, supersede, or modify the provisions of § 208 of the FWPCA because the Secretary has filled a regulatory gap where the EPA has no authority to act and the states have not yet promulgated a regulatory program. This interpretation also is supported by the language of § 702(a)(3) of the Act. 30 U.S.C. § 1292(a)(3). Section 702(a)(3) provides that the regulations implementing the Act shall not supersede, modify, amend or repeal the provisions of the FWPCA and its regulations and the "State laws enacted pursuant thereto." Because the states have not yet enacted and implemented regulatory programs, the prohibition of the Act has not been violated.

Amherst's other two challenges concern the failure of §§ 715.17(a) and 717.17(a) to include variance and exemption provisions similar to those in the FWPCA regulatory program. *See* 40 C.F.R. §§ 434.22, 434.32, 434.42 (1977). The exemptions for unusual precipitation events cited by Amherst may more appropriately be described as the absence of regulation. *See* 40 C.F.R. §§ 434.-22(c), 434.32(b), 434.42(b) (1977). The provi-

sions state that certain overflows and discharges are not subject to the effluent limitations of the regulations. *Id.* Thus, the lack of regulation also will be interpreted as a regulatory gap that has been filled by the Surface Mining Control and Reclamation Act and its regulations. Therefore, the court cannot conclude that the Secretary's decision to regulate in this area was arbitrary, capricious or inconsistent with law. Furthermore, §§ 715.17(a) and 717.17(a) do not amend, supersede, modify or repeal the FWPCA regulatory program.

The variance procedures referred to by Amherst provide relief from the effluent limitations of the FWPCA regulations. 40 C.F.R. §§ 434.22, 434.32, and 434.42 (1977). This court has already upheld the numerical effluent limitations promulgated by the Secretary. 452 F.Supp. at 343. With respect to variances, the court also noted that "Throughout the Act Congress made it clear that the only alternative that the operators had was to comply or not conduct operations." *Id.* at 338–339. The absence of variance procedures in the regulations presently before the court also will be construed as the plugging of a regulatory gap with a more stringent program. The tightening of the FWPCA program by the Secretary did not amend, supersede, modify or repeal · the FWPCA regulatory program within the meaning of § 702(a)(3). Thus, the court concludes that the Secretary's action in fulfilling the statutory mandate of § 515(b)(10) that he promulgate a comprehensive program to prevent water pollution was not arbitrary, capricious, or inconsistent with § 702(a)(3). 30 U.S.C. §§ 1265(b)(10), 1292(a)(3). Therefore §§ 715.17(a) and 717.17(a) will be upheld because the regulations do not amend, supersede, modify or repeal the provisions of the FWPCA and its regulations.

Plaintiffs also challenge § 715.-17(d)(3) of the regulations which prohibits operators from disturbing land within 100 feet of an intermittent or perennial stream unless authorized by the regulatory authority to do so. The plaintiffs contend that § 715.17(d)(3) is arbitrary and capricious and not supported by the basis and purpose statement or the administrative record. It is readily apparent, however, that the buffer zone requirement is a reasonable effort to protect the water quality of streams and is supported by the basis and purpose statement. 42 Fed.Reg. 62652 (Dec. 13, 1977). With respect to support in the administrative record, the Secretary has pointed to ample support, but the sources relied upon in the government's brief were not listed in the certified index in reference to § 715.-17(d)(3). Therefore, the court will require that the Secretary receive additional comments concerning this regulation in light of the recent reference to specific support for the regulation and the Secretary shall reconsider the regulation in light of the additional comments received. The court will not enjoin enforcement of the regulation, however, because: 1) the requirement of the regulation is reasonable and the regulation is not arbitrary, capricious, or inconsistent with law; 2) the regulation contains a variance procedure based upon authorization by the regulatory authority; and 3) the requirement of the regulation is supported by state authorities[11] and technical literature.[12]

Plaintiffs' next attack is directed at the road gradient requirements of § 715.-17(1)(2)(ii). Plaintiffs claim the requirements are unreasonable and the regulation lacks support in the basis and purpose statement and the administrative record. The regulation sets maximum grades for roads associated with surface mining operations. This court is of the opinion that the regula-

11. *See* Ky.Rev.Stat. § 350.085(4); Alabama Guidelines for Minimizing the Effects of Surface Mining on Water Quality at 2.

12. *See* Grim & Hill, Environmental Protection in Surface Mining of Coal; U.S. Environmental Protection Agency Report; 118 (1974); Weigle Designing Coal-Haul Roads for Good Drainage U.S. Department of Agriculture, Forest Service (1965); Guidelines for Construction of Mine Roads, Region 10, U.S. Environmental Protection Agency (included as Appendix D to Grim & Hill, *supra,* at 255).

tion is reasonable and consistent with the Act. § 515(b)(10), 30 U.S.C. § 1265(b)(10); see H.R.Rep.No.95–218, 95th Cong., 1st Sess. 128, reprinted in [1977] U.S.Code Cong. & Admin.News pp. 593, 660. Furthermore, there is adequate support for the road gradient requirements in the basis and purpose statement[13] and the administrative record.[14] Therefore, § 715.17(1)(2)(ii) of the regulations will be upheld.

 Plaintiffs also challenge sections 715.18(b)(3)(ii) and (vii) of the regulations which set standards for the construction of waste dams.[15] Section 715.18(b)(3)(vii) requires that the facility be capable of evacuating "90 percent of the volume of water stored during the design precipitation event within 10 days." Section 715(b)(3)(ii) imposes a three-foot freeboard requirement between the top of the dam and the surface of the water impounded. Plaintiffs contend that these requirements are unreasonable and lack adequate support in the basis and purpose statement and the administrative record. As to both the freeboard and the 90 percent drawdown requirement, the Secretary noted in the basis and purpose statement that regulation of waste dams was necessary in order to protect the public and the environment. 42 Fed.Reg. 62658 (Dec. 13, 1977). The government's discussion in its brief of the drawdown and freeboard requirements indicates that the regulations are reasonable and adequately supported by the administrative record. See

Defendants' Memorandum in Opposition to Motions for Summary Judgment and Partial Summary Judgment at 22–28. The problem, however, is that the Secretary resolved some differences of opinion and made several policy judgments that were not disclosed in the basis and purpose statement. The discussion of the requirements in the basis and purpose statement is very brief and the authorities cited by the Secretary do not supply the direct support indicated. See 42 Fed.Reg. 62658 (Dec. 13, 1977); U.S. Corps. of Engineers, Engineering & Design Stability of Earth and Rock-Fill Dams, Engineer Manual EM 1110–2–1902 (1970). The government's discussion at this stage is much more detailed. Although the scope of the discussion in the basis and purpose statement need not have been as detailed as the present explanation, disclosure of the decisions and policy judgments made was necessary. Given the expanded "statement of basis and purpose" now revealed by the government, the Secretary should accept additional comments and reconsider the regulation. Faced with a similar situation with regard to the stream buffer zone requirement, the court did not enjoin the operation of the regulation pending review. Unlike the buffer zone requirement, however, these dam requirements are absolute and there is no variance procedure. In addition, a change in the requirements at issue here at a later date will have a greater effect on methods of construction and operation.[16] Therefore, enforcement of sec-

13. 42 Fed.Reg. 62657–58 (Dec. 13, 1977).

14. Weigle, supra note 12, at 3; see Grim & Hill, supra note 12, at 116; Packer, Criteria for Designing & Locating Logging Roads to Control Sediment 7–8 (1967) (printed in Forest Science, vol. 13, no. 1, March, 1967). The road gradient requirements are also supported by the regulations of several states. Tenn. Regs. ch. 0400–3–7–.02(3); W.Va. Surface Mining Regs. ch. 20–6, series VII, § 502(a)–(c); see Mont. Surface Mining Regs. ch. 26–2.10(10)–S20310, p. 48.31.

15. The National Coal Association and other plaintiffs also challenge what they describe as "the required abandonment of dams impounding waste." Although no specific regulation is cited, the plaintiffs apparently are referring to

§ 715.18(b)(8) of the regulations. Section 715.18(b)(8) provides:

All dams shall be removed and the disturbed area regraded, revegetated, and stabilized before the release of bond unless the regulatory authority approves retention of such dams as being compatible with an approved postmining land use.

On its face, the regulation is not an absolute prohibition. Furthermore, the regulation is adequately supported by the Act and the basis and purpose statement. 30 U.S.C. § 1265(b)(13); 42 Fed.Reg. 62658 (Dec. 13, 1977). Therefore, the regulation will be upheld.

16. The public safety and environment will continue to be protected to a certain extent by the Mine Enforcement and Safety Administration regulations which will remain in effect.

tions 715.18(b)(ii) and (vii) will be enjoined until the Secretary issues his decision concerning reconsideration of the drawdown and freeboard requirements.

## D. *Explosives.*

 The plaintiffs challenge several provisions of the regulations which limit the use of explosives in surface mining operations.[17] The first attack is directed at § 715.19(e)(1)(vi) which establishes a decibel limit for air blasts caused by the use of explosives. The limit established by the regulation is a 128 decibel linear peak. The operators contend that a 136 decibel limit would be reasonable and supported by the record. The record reveals, however, that the 128 decibel limit was at the lower end of the range recommended by the Bureau of Mines and that the limit is reasonable and supported by the record. *See* 42 Fed. Reg. 62658 (Dec. 13, 1977). The action taken by the Secretary reflects a policy judgment traditionally left to the discretion of the authority promulgating regulations. The Secretary's explanation of his action in the basis and purpose statement was adequate and the standard imposed is supported by authorities identified in the basis and purpose statement and the certified index.

The plaintiffs also challenge the particle velocity limitation of § 715.19(e)(2)(ii). Section 715.19(e)(2)(ii) limits, in all blasting operations, the maximum peak particle velocity of the ground motion in any direction to 1 inch per second at the immediate location of dwellings or certain buildings. Again the plaintiffs assert that the limitation is unreasonable and not supported by the administrative record. The record indicates, however, that the Secretary carefully weighed conflicting recommendations and reached a reasonable result that ensures the safety of the public and the protection of property. 42 Fed.Reg. 62659 (Dec. 13, 1977); Nicholls *et al.,* Blasting Vibrations &

Their Effects on Structures (U.S. Bureau of Mines Bulletin 656) (1971); *see Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 397, 434–435, 541 F.2d 1, 24, 37–38 *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Although a more lenient standard also might be reasonable, the court cannot conclude that the Secretary's action in promulgating the regulation was arbitrary, capricious, or inconsistent with law. Therefore, the maximum peak particle velocity regulation will be upheld.

## E. *Enforcement.*

Plaintiffs next set of challenges is directed at several provisions of the regulations that deal with enforcement of the regulations. The first attack concerns the warrantless search provision of § 721.12. Section 721.12 of the regulations authorizes warrantless searches by representatives of the Secretary of surface coal mining and reclamation operations and premises in which any records required to be maintained are located. The Secretary has indicated that the scope of the regulation will be limited by: 1) a clarification which will require inspectors to obtain warrants before entering any building on the permitted area; and 2) confining warrantless inspections to the permit area and areas where monitoring equipment or records are kept which will insulate other buildings not regulated under the Act from warrantless inspections. Thus, the narrowed issue before the court is the permissibility of warrantless inspections of the permit area.

 In light of *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the government asserts three justifications for the warrantless search provision: 1) the need, as perceived by Congress, for prompt unannounced inspections to ensure compliance with the Act; 2) the operators' implied consent to warrantless searches by their participation

---

**17.** The plaintiffs again challenge the distance limitations of § 715.19(e)(1)(vii). Plaintiffs' assertions were rejected by the court in its earlier opinion. 452 F.Supp. at 341–342. The plaintiffs have not persuaded the court to change its

conclusion that the limitations are not arbitrary, capricious, or inconsistent with law. Furthermore, the regulation is adequately supported by the basis and purpose statement. 42 Fed.Reg. 62658–59 (Dec. 13, 1977).

in a pervasively regulated industry; and 3) the operators' lack of privacy interest because of the location of the areas to be inspected in "open fields." It is now well settled that the Fourth Amendment's warrant requirement applies to commercial buildings and that warrantless searches are generally unreasonable "unless some recognized exception to the warrant requirement applies." *Marshall, supra,* 98 S.Ct. at 1819–20. Thus, the Secretary asserts that the pervasively regulated industry and open fields exceptions apply here.

▪ The Secretary argues that because surface mining operations occur in "wide-open areas," the operators have no significant privacy interests that necessitate the protection of a warrant requirement. This theory is, in essence, the "open fields" exception to the fourth amendment warrant requirement. *Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861, 865, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974); *see Hester v. United States,* 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924). In the absence of a concrete factual setting it is impossible for the court to determine the applicability of this exception. *See Diamond Shamrock Corp. v. Costle,* 188 U.S. App.D.C. at —— — ——, 580 F.2d at 672–674 (1978). It would be inappropriate and improper for the court to consider in a generalized factual setting the issues of how "open" mining operations are and the privacy interests and expectations of the operators. Therefore, the court will not consider whether the open fields exception to the fourth amendment's warrant requirement validates the warrantless search provision of § 721.12 of the regulations.

▪ The Secretary also contends that the exception from the search warrant requirement which has been recognized for pervasively regulated businesses and closely regulated industries applies here. *Marshall, supra,* 98 S.Ct. at 1820–21; *United States v. Biswell,* 406 U.S. 311, 315–17, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 74–77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Under this exception, certain industries, like liquor

and firearms, "have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Marshall, supra,* 98 S.Ct. at 1821 (citation omitted). It appears that the coal industry can be distinguished from ordinary businesses by its "long tradition of close government supervision of which any person who chooses to enter such a business must already be aware" and thus, the exception to the warrant requirement applies because of the operators' implied consent. *Marshall, supra,* at 1821; *see Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

Regulation of the coal industry has been more pervasive and specific than that mandated by OSHA which was at issue in *Marshall. See Youghiogheny & Ohio Coal Co. v. Morton,* 364 F.Supp. 45, 49–50 & n. 3 (S.D. Ohio 1973) (three-judge court). In *Youghiogheny,* the court upheld the warrantless search provisions of the Federal Coal Mine Health & Safety Act of 1969, 30 U.S.C. § 801 *et seq.,* and found the coal industry to be a "pervasively regulated industry." *Id.* at 50. The establishment of the Bureau of Mines began the federal regulation of coal mining in 1910 and federal inspectors were authorized to enter and inspect mines for health and safety hazards, which is the focus of the present Act, in 1941. *See* Coal Mine Safety Act of 1941, 55 Stat. 177 (formerly 30 U.S.C. § 451 *et seq.* ). The fact that the present Act focuses on the environmental harm of surface mining and the surface effects of underground mining does not affect the finding that the industry is pervasively regulated. The primary concern of the Act, like the other regulatory statutes, is the public health and safety. In addition to being regulated under the Federal Coal Mine Health and Safety Act of 1969, the industry is also subject to provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.,* the Clean Air Act, 42 U.S.C. § 1857 *et seq.,* and the Black Lung Benefits Act of 1972, 30 U.S.C. § 901 *et seq.* Furthermore, the industry also is regulated by many of the states.

Given the operators consent to certain restrictions by virtue of their operations in a pervasively regulated industry, the court also concludes that the warrantless search provisions of the Act and the regulations are reasonable as limited by the Secretary. As was noted above, no building will be entered without a search warrant, therefore, warrantless inspections of the permit area will only be conducted. The reasonableness of the warrantless inspections also is evidenced by the need, as perceived by Congress, for such searches. *See* 30 U.S.C. §§ 1252(e), 1267(a), (b)(3). Furthermore, the extent of the warrantless inspections is reasonably limited in time, place, and scope. *See United States v. Biswell, supra,* 406 U.S. at 315, 92 S.Ct. 1593, 32 L.Ed.2d 87. As was indicated above, the place of the search is limited to the permit area, excluding buildings. The time of the searches, at least with respect to records and monitoring equipment, is limited by statute to "reasonable times." 30 U.S.C. § 1267(b)(3). The scope of the search also is limited to that necessary to ascertain whether the operations are in compliance with the Act and the regulations. *See* 30 U.S.C. §§ 1252(e), 1267(a). Finally, the need for, and therefore the reasonableness of, warrantless searches are supported by the necessity of the inspections in order to ensure that the public health and safety and the environment are protected.

Plaintiffs also question the constitutionality of sections 521(a)(2) and (3) [18] of the Act and 722.11 of the regulations which permit the Secretary to order cessation of coal mining operations without prior notice or a hearing. The plaintiffs contend that these provisions violate the Due Process Clause of the Fifth Amendment to the Constitution. Section 521(a)(2) of the Act requires that a federal inspector issue a cessation order when a violation of a permit condition or any other condition or practice: 1) "creates an imminent danger to the health or safety of the public;" or 2) "is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air or water resources." 30 U.S.C. § 1271(a)(2).[19] In providing for the issuance of cessation orders, sections 722.11(a) and (b) of the regulations adopt the language of the Act.

Although the Constitution generally requires notice and a hearing prior to a governmental deprivation of private property, there are exceptions to this requirement in extraordinary and emergency situations where a significant government interest justifies delaying the hearing until after the deprivation. *Fuentes v. Shevin,* 407 U.S. 67, 90–92, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Boddie v. Connecticut,* 401 U.S. 371, 378–79, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Summary administrative action prior to a hearing has been upheld by the Supreme Court in these situations in order to protect an important governmental or public interest.[20] *E. g., Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 677–80, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (seizure of rental yacht carrying marijuana); *Ewing v. Mytinger & Casselberry, Inc.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (cessation of sales of mislabeled foods); *Sink v. Morton,* 529 F.2d 601, 604 (4th Cir. 1975) (withdrawal order under Federal Coal Mine Health & Safety Act); *Case v. Weinberger,* 523 F.2d 602, 606–09 (2d Cir. 1975) (decertification of nursing home); *Air East, Inc. v. National Transportation Safety Board,* 512 F.2d 1227, 1231–32 (3rd Cir.), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975) (decertification of air taxi line); *R.A. Holman & Co. v. SEC,* 112 U.S.App.D.C. 43, 49–50, 299 F.2d 127, 131–33, *cert. denied,* 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962) (suspension of exemption from stock registration requirement).

---

**18.** The ground for plaintiffs challenge to § 521(a)(3) of the Act, 30 U.S.C. § 1271(a)(3), is unclear because the section is not discussed by the plaintiffs. Furthermore, that section only provides for the issuance of notices of violation and not cessation orders. Therefore, section 521(a)(3) will be upheld because the plaintiffs have failed to show its unconstitutionality and the court is unable to discern any infirmity.

**19.** A cessation order may be directed at only a portion of the mining operation rather than the entire operation. 30 U.S.C. § 1271(a)(2).

**20.** The Courts of Appeals also have upheld prehearing deprivations in exceptional circumstances. *E. g., General Mills, Inc. v. Jones,* 530 F.2d 1317, 1323 (9th Cir. 1975), *aff'd sub nom.,*

339 U.S. 594, 599–600, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of mislabeled vitamin product); *Bowles v. Willingham*, 321 U.S. 503, 519–21, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (rent control orders); *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589, 595–97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (collection of federal revenue); *Central Union Trust Co. v. Garvan*, 254 U.S. 554, 566, 41 S.Ct. 214, 65 L.Ed. 403 (1921) (seizure of enemy property); *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 315–21, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of contaminated food). Similarly, section 521(a)(2) of the Act provides for summary action by the Secretary through his representatives in emergency or extraordinary situations and its provisions comply with the requirements of the due process clause.

The standards of the due process clause to be applied to statutes which allow deprivations prior to a hearing were enunciated by the Supreme Court in *Fuentes v. Shevin*. The court must find:

First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Fuentes, supra,* 407 U.S. at 91, 92 S.Ct. at 2000; *see Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (court should consider private interest, public interest, and risk of erroneous deprivation). The standards of § 521(a)(2) of the Act and the provisions of the regulations that apply and interpret the Act meet this test. First, the deprivation under a cessation order does "secure an important governmental or public interest." *See* 30

U.S.C. § 1201(c) (congressional finding of public and governmental interests). The Act seeks to protect the "health and safety of the public" and the "land, air, and water resources" of the United States. 30 U.S.C. § 1271(a)(2). Similar interests have been sufficient to warrant deprivations prior to a hearing in other instances. *See, e. g., Ewing, supra,* 339 U.S. at 599–600, 70 S.Ct. 870 (public health); *North American Cold Storage Co., supra,* 211 U.S. at 315–21, 29 S.Ct. 101 (public health); *Sink v. Morton,* 529 F.2d 601, 604 (4th Cir. 1975) (public safety); *Morton v. Dow,* 525 F.2d 1302, 1305–06 (10th Cir. 1975) (public safety).

Secondly, the use of cessation orders is limited to circumstances where there "is a special need for very prompt action." As was noted above, cessation orders can only be issued where there is imminent danger to the public health or safety or there is a reasonable risk of significant, imminent environmental harm.[21] The need for prompt action is further supported by the substantial governmental and public interests involved.

Finally, the standards of the Act and the regulations will maintain "strict control over [the government's] monopoly of legitimate force" and will reduce "the risk of an erroneous deprivation." *Fuentes, supra,* 407 U.S. at 91, 92 S.Ct. at 2000; *Mathews, supra,* 424 U.S. at 335, 96 S.Ct. 893 at 903. Under the Act, the government itself acts through its authorized representatives rather than through private parties. *See Fuentes, supra,* 407 U.S. at 93, 92 S.Ct. 1983. One of the plaintiffs' main contentions is that the standards under which a cessation order may be issued are too vague, subjective, and broad. Section 701(8) of the Act defines the threat of "imminent danger to the health and safety of the public" as the existence of a condition which could:

reasonably be expected to cause substantial physical harm to persons outside the permit area before such condition, prac-

---

21. If there is no imminent danger, a notice of violation is issued under § 521(a)(3). 30 U.S.C. § 1271(a)(3).

tice, or violation can be abated. A reasonable expectation of death or serious injury before abatement exists if a rational person, subjected to the same conditions or practices giving rise to the peril, would not expose himself or herself to the danger during the time necessary for abatement.

30 U.S.C. § 1291(8). Section 700.5 of the regulations defines a "significant, imminent environmental harm to land, air or water resources" as follows:

(i) An environmental harm is any adverse impact on land, air, or water resources, including but not limited to plant and animal life.

(ii) An environmental harm is imminent if a condition, practice or violation exists which (a) is causing such harm or (b) may reasonably be expected to cause such harm at any time before the end of the reasonable abatement time that would be set under section 521(a)(3) of the Act.

(iii) An environmental harm is significant if that harm is appreciable and not immediately reparable.

The court concludes that these standards are sufficiently specific to strictly control government action in order to reduce the risk of an erroneous deprivation.[22] The adequacy of these standards is further evidenced by an examination of similar standards that have been upheld in other areas. See, e. g., Ewing, supra, 339 U.S. at 595–96, 70 S.Ct. at 871 ("dangerous to health . . . or would be in a material respect misleading to the injury or damage of the purchaser or consumer"); Fahey v. Mallonee, 332 U.S. 245, 250–51 n. 1, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947) ("is in an unsound or unsafe condition, or has a management which is unsafe or unfit to manage a Feder-

al savings and loan association"); Sink, supra, 529 F.2d at 604 ("could significantly and substantially contribute to the cause and effect of a mine safety or health hazard;" 30 U.S.C. § 814(c)(1)).[23]

As the defendants have noted, this case and the statute at hand are analogous to the situation and standards faced by the Supreme Court in Ewing v. Mytinger & Casselberry, Inc. In Ewing, the Supreme Court upheld the Food and Drug Administration's seizure of misbranded articles under the standard quoted above. 339 U.S. at 599–600, 70 S.Ct. 870. The Supreme Court stated:

Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.

339 U.S. at 599, 70 S.Ct. at 873. In the scheme presently before the court, the administrative official's discretion is sufficiently limited while allowing him the discretion to protect the government's and the public's interests.

Finally, the plaintiffs allege that the statute fails to provide a prompt hearing after the issuance of a cessation order. After the issuance of a cessation order, several options are available to an operator. Under § 525(c) the operator may request temporary relief from the Secretary who must issue an order or decision on the request within five days of its receipt. 30 U.S.C. § 1275(c). In order for relief to be granted, a hearing must be held, but one is not required if relief is denied. Id. Section 525(b) of the Act provides formal review

---

22. In reaching this conclusion, the court obviously disagrees with Peabody's assertions that the definitions in the regulations improperly broaden rather than specifically interpret the provisions of the Act.

23. In Sink, the court did not expressly address the issue of the specificity of the standards. 529 F.2d at 604. The 1977 amendments to the Federal Coal Mine Health and Safety Act re-

structured the provision of the Act and the same standards are now at 30 U.S.C. § 814(d)(1). A withdrawal order under the provisions requires a finding of two violations in the same inspection or within 90 days of a previous inspection, and they must be a result of an operator's unwarrantable failure to comply with the health and safety standards of the Act. 30 U.S.C. § 814(d)(1).

procedures for a cessation order. 30 U.S.C. § 1275(b). Under this section, in conjunction with § 525(a), unless temporary relief has been granted, a hearing must be held and the Secretary must issue his written decision within 30 days of receipt of the operator's application for review.[24] 30 U.S.C. §§ 1275(a), (b). In addition to the formal review procedure, § 521(a)(5) of the Act and § 722.15 of the regulations provide an informal review procedure. 30 U.S.C. § 1271(a)(5). Under these provisions an informal hearing at or near the minesite must be held within 30 days of the operator's request for relief and OSM must issue a written decision within 15 days of the hearing. 30 U.S.C. § 1271(a)(5); 30 C.F.R. § 722.15. Finally, under § 521(a)(5) of the Act a cessation order expires after 30 days if a public hearing has not been held at or near the minesite. Therefore, the court concludes that adequate procedures for a prompt hearing and administrative review, with judicial review thereafter, are provided by the Act and the regulations. In consideration of the entire statutory and regulatory scheme surrounding the issuance of cessation orders under § 521(a)(2) of the Act and § 722.11 of the regulations, this court finds that the provisions of the Act and the regulations comport with the Due Process Clause of the Fifth Amendment to the Constitution.

 In reference to the public hearing within thirty days requirement of § 521(a)(5), plaintiffs contend that § 722.15 of the regulations improperly allows this standard to be satisfied by an informal mine-site hearing. 30 U.S.C.A. § 1271(a)(5); 30 C.F.R. § 722.15. Plaintiffs contend that the Act requires a full adjudicatory hearing before an Administrative Law Judge of the Board of Surface Mining and Reclamation Appeals under the standards of the Administrative Procedure Act, 5 U.S.C. § 554.[25] The Act and its legislative history, however, support the Secretary's interpretation that § 521(a)(5) only requires an informal hearing within 30 days of the cessation order. When Congress intended that public hearings conducted under the Act be held in accordance with the procedures of 5 U.S.C. § 554, it explicitly stated the requirement. See 30 U.S.C. §§ 1264(c), 1268(b), 1275(a)(2), 1275(d), 1293(b). The public hearing requirement of § 521(a)(5) does not contain such a requirement and Congress did not indicate that the hearing should be "on the record," which further indicates that the APA does not apply. See United States v. Florida East Coast Railway, 410 U.S. 224, 236–38, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); American Telephone & Telegraph Co. v. FCC, 572 F.2d 17, 21–22 (2d Cir. 1978); Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 247–248, 483 F.2d 1238, 1250–51 (1973). In addition, the entire statutory scheme of administrative review of cessation orders does not indicate that Congress intended to provide a hearing controlled by 5 U.S.C. § 554. See Seacoast Anti-Pollution League v. Costle, 572 F.2d 872, 876 (1st Cir. 1978). Furthermore, the legislative history of the provision, which was added by a floor amendment, reveals that Congress only in-

24. Judicial review of the Secretary's decision is available under § 526 of the Act. 30 U.S.C. § 1276. The Act also provides standards to be applied by the court in the consideration of temporary relief. 30 U.S.C. § 1276(c).

25. Much of plaintiffs' argument is weakened by the fact that under the formal review procedures of § 525(a)(1) a hearing must be held and pursuant to § 525(a)(2) the hearing is subject to 5 U.S.C. § 554. 30 U.S.C. §§ 1275(a)(1), (2). Furthermore, because the Secretary must issue his decision upon review of a cessation order within 30 days of receipt of the operator's application for relief under § 525(b), the hearing necessarily must be held within 30 days of receipt of the operator's application for review.

30 U.S.C. § 1275(b). Therefore, prompt action by the operator with respect to an application for review will result in a hearing subject to the requirements of 5 U.S.C. § 554 within 30 days of the cessation order. In any event, because the operator must file his application for review within 30 days of receipt of the cessation order, the absolute maximum time that would be required for a full adjudicatory hearing would be 60 days. 30 U.S.C. § 1275(a). Even if the full 60 days was required, it would not be an unreasonable period of time for a hearing and decision. See Air East, Inc. v. National Transportation Safety Board, 512 F.2d 1227, 1231–32 (3rd Cir.), cert. denied, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975).

·tended to require an informal hearing within 30 days of a cessation order under § 521(a)(5). 123 Cong.Rec. S12443 (daily ed. July 20, 1977) (remarks of Sen. Metcalf); 123 Cong.Rec. H7586 (daily ed. July 21, 1977) (remarks of Rep. Udall). Therefore, the court finds that the Secretary's interpretation of § 521(a)(5) of the Act in § 722.15 of the regulations is not arbitrary, capricious, or inconsistent with law.

 Plaintiffs' next attack on the enforcement procedures of the regulations is directed at section 722.12(d).[26] Section 722.12(d) of the regulations interprets § 521(a)(3) of the Act to allow an operator a maximum of 90 days to abate a violation after a notice is issued. Section 521(a)(3) provides:

> [T]he Secretary or authorized representative shall issue a notice to the permittee or his agent fixing a reasonable time but not more than ninety days for the abatement of the violation and providing opportunity for public hearing.
>
> If, upon expiration of the period of time as originally fixed or subsequently extended, for good cause shown and upon the written findings. . . .

30 U.S.C. § 1271(a)(3). The plaintiffs contend that the language allowing extensions of time for abatement for good cause shown permits extensions beyond the 90-day maximum period for abatement. Under plaintiffs' interpretation of the Act, the initial period set by the notice of violation cannot exceed 90 days, but the period can be subsequently extended beyond 90 days for good cause shown. If the court adopts the plaintiffs' interpretation, however, the 90-day requirement will be devoid of any meaning.[27] Because there is an ambiguity in the statute with respect to the 90-day limit and extensions of time, the court finds it necessary to review the legislative history. In addition to being ambiguous on its face, reading the provision in question in accordance with the statute as a whole, the court cannot accept plaintiffs' view of the "plain meaning" of the section. Both the House and Senate Reports support the Secretary's interpretation and the Senate Report is particularly instructive because the language in the Senate bill is identical to the language of the Act. S.Rep.No.95–128, 95th Cong., 1st Sess. 91 (1977); H.R.Rep.95–218, 95th Cong., 1st Sess. 130, *reprinted in* [1977] U.S.Code Cong. & Admin.News pp. 593, 662. Therefore, the court will uphold § 722.12(d) because it is not arbitrary, capricious, or inconsistent with law.

 Plaintiffs' final challenge to the enforcement provisions of the regulations concerns § 722.16(d)(2) and standards for the revocation of permits for a pattern of violations. Plaintiffs contend that the regulation improperly allows the Secretary to revoke a permit for past violations that have been abated rather than only for presently existing violations.[28] Section 521(a)(4) of

---

**26.** Plaintiffs also allege that sections 722.17(a) and (b) are arbitrary, capricious, and inconsistent with the Act. Plaintiffs offer nothing more than their assertion in support of this contention. These provisions state that an "inability to comply" is not a sufficient ground to vacate a notice of violation or a cessation order and it is not a showing of "good cause" to prevent the suspension or revocation of a permit. 30 C.F.R. §§ 722.17(a), (b). In its earlier opinion, this court found that "[t]hroughout the Act Congress made it clear that the only alternative that the operators had was to comply or not conduct operations." 452 F.Supp. at 338–339. In light of the discussion of the Act in its prior decision, this court cannot conclude that §§ 722.17(a) and (b) are arbitrary, capricious, or inconsistent with the Act. *See* 452 F.Supp. at 338–339.

**27.** As the defendants note, it is a standard precept of statutory construction that a statute be read so as to give each of its terms meaning. *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed. 207 (1973); *Certified Color Manufacturers Ass'n v. Mathews,* 177 U.S.App.D.C. 137, 149, 543 F.2d 284, 296 (1976).

**28.** Plaintiffs also contend that § 722.16(d)(2) is invalid because it differs from the proposed regulation and therefore, they were denied an adequate opportunity to comment. Plaintiffs' contentions are without merit. *See Chrysler Corp. v. Department of Transportation,* 515 F.2d 1053, 1061 (6th Cir. 1975); 5 U.S.C. § 553(b)(3). Plaintiffs' theory besides being a disincentive to amendments in regulations based on the comments, also would require greatly protracted rulemaking procedures.

the Act establishes the following standard for determining if there is a pattern of violations requiring a notice to show cause:

> [A] pattern of violations of any requirements of this chapter or any permit conditions required by this chapter exists or has existed, and if the Secretary or his authorized representative also find [sic] that such violations are caused by the unwarranted failure of the permittee to comply with any regulations of this chapter or any permit conditions, or that such violations are willfully caused by the permittee . . . .

30 U.S.C. § 1271(a)(4). Section 722.16(d)(2) of the regulations provides that:

> If the Secretary finds that a pattern of violations exists or has existed the permit and right to mine under this Act shall be either suspended or revoked. . . .

30 C.F.R. § 722.16(d)(2). The plaintiffs contend that if Congress had intended that past corrected violations be included in the determination of a pattern of violations the Act would have read "are or were caused by the unwarranted failure" and "are or were wilfully caused." Plaintiffs' interpretation, however, would leave the words "has existed" used in reference to a pattern of violations without any meaning. Plaintiffs' attempts to limit a pattern of violations to existing violations without regard for past violations is not supported by the Act. Given the ambiguity in the Act, the court will again consider the legislative history of the Act. Section 521(a)(4) is identical to the pattern of violations provision in the Senate bill and the Senate Report supports the Secretary's interpretation. S.Rep.No.95–128, 95th Cong., 1st Sess. 89 (1977); see S.Rep.No.95–337, 95th Cong., 1st Sess. 110 (1977) (Conference Report). The Secretary has reasonably interpreted the language of the statute and the regulation will be upheld because it is not arbitrary, capricious, or inconsistent with law.

F. *Indian Lands.*

Plaintiffs last set of challenges concerns the regulation of surface mining and the surface effects of underground mining on Indian lands. 25 C.F.R. § 177.101 *et seq.*; 42 Fed.Reg. 63394–63410 (Dec. 16, 1977).

First, the plaintiffs contend that the Secretary has improperly included enforcement provisions in the regulations promulgated for Indian lands. *See* 25 C.F.R. §§ 177.112, 177.113, 177.114. Section 710(c) of the Act provides:

> [A]ll surface coal mining operations on Indian lands shall comply with requirements at least as stringent as those imposed by subsections (b)(2), (b)(3), (b)(5), (b)(10), (b)(13), (b)(19), and (d) of section 1265 of this title and the Secretary shall incorporate the requirements of such provisions in all existing and new leases issued for coal on Indian lands.

30 U.S.C. § 1300(c). Section 710(a) of the Act provides:

> The Secretary is directed to study the question of the regulation of surface mining on Indian lands which will achieve the purpose of this chapter and recognize the special jurisdictional status of these lands. In carrying out this study the Secretary shall consult with Indian tribes. The study report shall include proposed legislation designed to allow Indian tribes to elect to assume full regulatory authority over the administration and enforcement of regulation of surface mining of coal on Indian lands.

30 U.S.C. § 1300(a). Under § 710(b), the study report was to be submitted to Congress no later than January 1, 1978. Apparently the study has not yet been submitted to Congress. The plaintiffs contend that Congress' failure to include the enforcement provisions of the Act in the provisions enunciated in § 710 as part of the Indian lands interim program coupled with the requirement that the Secretary study the jurisdictional status and submit proposed legislation to Congress, compels the conclusion that the Secretary is without authority to enforce the provisions of the Indian lands interim program. The plaintiffs also contend that the inclusion of § 517, the inspections and monitoring provision, in the sections enumerated in 710(d) to be included in the permanent regulatory program further supports their interpretation of the Act.

Although the plaintiffs' view of the statutory scheme appears to have some

merit in light of the ambiguities of the Act, the court is unable to find the Secretary's actions in interpreting and implementing the Act arbitrary, capricious, or inconsistent with law. Section 710(e) states:

> With respect to leases issued after August 3, 1977, the Secretary shall include *and enforce* terms and conditions in addition to those required by subsections (c) and (d) of this section as may be requested by the Indian tribe in such leases.

30 U.S.C. § 1300(e) (emphasis added). Thus, it may be inferred that Congress intended the Secretary to enforce the provisions of the interim program under § 710(c) as well as the additional provisions included in the leases at the request of the Indian tribes. The Secretary's interpretation is further supported by the fact that the requirement of § 710(c) that the operators "shall comply with requirements" would be an empty mandate if the Secretary lacked the authority to enforce the requirements. Under the plaintiffs' construction of the Act, neither the Secretary, nor the states, nor the Indian tribes would have the power of enforcement to exact compliance with the requirements of the regulations.

The requirement of §§ 710(a) and (b) that a jurisdictional study be prepared and submitted does not compel a different result. The provision discussing proposed legislation is clearly aimed at turning over regulatory authority and enforcement powers to the Indians, a problem that continually plagued Congress.[29] In fact, the language to the effect that the Indian tribes be allowed "to elect to *assume*" enforcement of the regulation implies that another body, presumably the Secretary and OSM, would be enforcing the regulations until the election is provided for and made. 30 U.S.C. § 1300(a) (emphasis added). Therefore, this court cannot conclude that Congress intended to defer the designation of an interim regulatory authority with enforcement powers until the study was received and additional legislation enacted.

Because the provisions of § 710 of the Act are ambiguous on the enforcement issues, the court again will look to the legislative history for guidance. Section 710 of the Act is virtually identical to § 710 of the House bill which was adopted by the Conference Committee. S.Rep.No.95–337, 95th Cong., 1st Sess. 114 (1977) (Conference Report). The House Report that accompanied the bill states:

> Section 710 also requires operations on Indian lands to comply with requirements at least as stringent as the full program's provisions by 30 months after enactment. The Secretary is to enforce these provisions as well as incorporate such standards into existing and new leases.

H.Rep.No.95–218, 95th Cong., 1st Sess. 134, *reprinted in* [1977] U.S.Code Cong. & Admin.News pp. 593, 666. Thus, it is clear that Congress intended the enforcement provisions to apply to the permanent program and there is no reason for the court to conclude that Congress' intent was any different with respect to the interim program.

The absence of the enforcement sections from the list of provisions in § 710(c) also is not determinative. The section that designates the sections to be included in the regular interim program also did not include the enforcement sections. 30 U.S.C. § 1252(c). Although § 502(e) provided for enforcement in the regular interim program, with respect to Indian lands the court finds that sections 710(a) and (e) serve this purpose. §§ 30 U.S.C. 1252(e), 1300(a), (e). In addition, the inclusion of § 517 in the list of provisions to be implemented in the permanent Indian lands regulatory program is not conclusive. 30 U.S.C. § 1267. Section 517 concerns inspections and monitoring and not the enforcement provisions of prime concern in the interim regulatory program. *See* 30 U.S.C. §§ 1268, 1270, 1271, 1275. Plaintiffs also have referred the court to the proviso in § 523(a) that "except as provided in section 710 of this title the provisions of this chapter shall not

---

**29.** On numerous occasions, both the House and the Senate attempted to designate the Indian tribes as the regulatory authority with enforcement powers over Indian lands. *See, e. g.,* H.Rep.No.93–1072, 93rd Cong., 2d Sess. 116 (1974); H.Rep.No.94–189, 94th Cong., 2d Sess. 79 (1975); S.Rep.No.95–337, 95th Cong., 1st Sess. 114 (1977).

be applicable to Indian lands." 30 U.S.C. §§ 1273(a), 1300. As the court has noted above, sections 710(a) and (e) include the enforcement provisions of the Act in the Indian lands program by implication. Furthermore, as the defendants have noted, the thrust of this provision is to preclude the states from exercising regulatory authority over Indian lands.[30] Therefore, the court concludes that the Secretary's action in promulgating the regulations concerning enforcement of the provisions of the interim regulatory program for Indian lands was not arbitrary, capricious, or inconsistent with law.

In conjunction with their attack on the enforcement provisions, the plaintiffs also challenge the definition of a permit in 25 C.F.R. § 177.101. Section 177.101 provides that "Permit means an approval by the Secretary of the Interior to conduct surface coal mining and reclamation operations on Indian lands." Plaintiffs contend that although the Secretary is empowered to approve leases, he has no authority to issue or approve coal mining permits because § 506 of the Act was not mentioned in § 710(c). 30 U.S.C. §§ 1256, 1300(c). Because the court has found that sections 710(a) and (e) imply that the Secretary shall be the regulatory authority and enforce the requirements of the Act, the court concludes that the Secretary's action in including the definition of a permit in the Indian lands regulations was reasonable. Many of the enforcement provisions of the Act are directed at the permit requirements rather than the leasing arrangements that exist for Indian lands. Defining a permit as the Secretary's approval to mine on Indian lands was a proper method to resolve any ambiguities that might arise. Therefore, the court will uphold the regulation because it is not arbitrary, capricious, or inconsistent with law.

Finally, the plaintiffs assert that the court's decision with respect to certain provisions of the general regulations also should apply to identical or similar provisions of the Indian lands regulations. Thus, plaintiffs contend that where the same requirements are contained in both sets of regulations, if the court strikes a provision down in the general regulations it should do the same with respect to the Indian lands regulations. In reference to these "overlapping" regulations, the government relies on its arguments in support of the general regulations. Therefore, to the extent that provisions of the general regulations are the same as provisions of the Indian lands regulations, the court's decision also will apply to the provisions of the Indian lands regulations.

III. *Order.*

In accordance with the memorandum opinion above, it is, by this court, this 24th day of August, 1978,

ORDERED that the plaintiffs' motions for summary judgment be, and the same hereby are, denied and that judgment shall be entered for the defendants, *see* 6 *Moore's Federal Practice* ¶ 56.12 (1976) and cases cited therein, except as follows:

(1) plaintiffs' motion for summary judgment with respect to 30 C.F.R. § 716.7(a)(1) is hereby granted and use of the definition in the prime farmlands historical use clause ·is hereby enjoined and the regulation is remanded to the Secretary of the Department of Interior (Secretary) for reconsideration; and

(2) plaintiffs' motion for summary judgment with respect to the drawdown and freeboard requirements of 30 C.F.R. §§ 715.18(b)(3)(ii) and (vii) and 25 C.F.R. §§ 177.109(b)(3)(ii) and (vii) is hereby granted and enforcement of these provisions is hereby enjoined and the regulations are remanded to the Secretary for reconsideration; and it is further

ORDERED that West Virginia's motion to supplement the record, or in the alternative, to lodge a relevant document with the court, is hereby denied; and it is further

ORDERED that the Secretary shall reconsider 30 C.F.R. § 715.15(b) and 25 C.F.R.

---

**30.** In addition, the Secretary was empowered to regulate mining on Indian lands under the Omnibus Indian Minerals Act and its regula- tions. *See* 25 U.S.C. § 396d (1976); 25 C.F.R. § 177.1 *et seq.* (1977).

§ 177.106(b) in light of the March 1978 report by the Skelly & Loy consulting firm entitled Environmental Assessment of Mining Methods, Head-of-Hollow Fill and Mountaintop Removal, Interim Report, and the Secretary shall file a report with the court concerning his reconsideration within 60 days of the date of this Order; and it is further

ORDERED that the Secretary shall disclose the substance of the consultation mentioned in the basis and purpose statement, 42 Fed.Reg. 62646 (Dec. 13, 1977), and accept and consider additional comments with respect to these consultations in his review of 30 C.F.R. § 715.15(b)(7) and 25 C.F.R. § 177.106(b)(7); and it is further

ORDERED that the Secretary shall accept additional comments concerning the buffer zone requirement of 30 C.F.R. § 715.-17(d)(3) and 25 C.F.R. § 177.108(d)(3) and reconsider these regulations in light of the additional comments received.